## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CHERRY HILL CONSTRUCTION, INC.** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **CASE NO. 8:07-cv-3476-AW** |
| | | **Judge Alexander Williams, Jr.** |
| **GRUNLEY-WALSH JOINT** | * | |
| **VENTURES, LLC,** *et al.* | | |
| | * | |
| **Defendants.** | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANTS' MOTION TO STAY PENDING EXHAUSTION OF MANDATORY DISPUTES PROCEDURES

Defendants, Grunley-Walsh, LLC ("Grunley-Walsh") (previously Grunley-Walsh Joint Ventures, LLC), St. Paul Fire and Marine Insurance Company ("St. Paul"), and The Continental Insurance Company ("Continental"), by undersigned counsel, hereby file this Motion to Stay Pending Exhaustion of Mandatory Dispute Procedures, on grounds more fully set forth in Defendants' Memorandum in support thereof, which is being filed contemporaneously herewith, and is adopted fully herein by reference.

Respectfully submitted,

**HUDDLES & JONES, P.C.**

BY:     /s/ Nicole L. Campbell
        Nicole Lefcourt Campbell, Federal Bar #: 14336
        10211 Wincopin Circle, Suite 200
        Columbia, Maryland 21044
        (301) 621-4120 (Telephone)
        (301) 621-4473 (Facsimile)
        campbell@hjpc.com
        Attorneys for Defendants,

Grunley-Walsh, LLC (formerly known as
Grunley-Walsh Joint Venture, LLC),
St. Paul Fire and Marine Insurance Company and
The Continental Insurance Company

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 4th day of January, 2008, a copy of the foregoing

Motion to Dismiss, or in the Alternative, to Stay Pending Exhaustion of Mandatory Dispute

Procedures, was transmitted via facsimile and mailed, postage prepaid, to:

Joseph C. Kovars, Esquire
Jay Bernstein, Esquire
Ober, Kaler, Grimes & Shirver
A Professional Corporation
120 E. Baltimore Street
Baltimore, MD 21202-1643
(410) 685-1120 (Phone)
(410) 547-0699 (Facsimile)


/s/ Nicole L. Campbell
Nicole Lefcourt Campbell

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| **CHERRY HILL CONSTRUCTION, INC.** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **CASE NO. 8:07-cv-3476-AW** |
| | | **Judge Alexander Williams, Jr.** |
| **GRUNLEY-WALSH JOINT** | * | |
| **VENTURES, LLC,** *et al.* | | |
| | * | |
| **Defendants.** | | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO STAY PENDING EXHAUSTION OF MANDATORY DISPUTES PROCEDURES

Defendants, Grunley-Walsh, LLC ("Grunley-Walsh") (previously Grunley-Walsh Joint Ventures, LLC), St. Paul Fire and Marine Insurance Company ("St. Paul"), and The Continental Insurance Company ("Continental") submits this memorandum in support of its Motion to Stay Pending Exhaustion of Mandatory Disputes Procedures. As set forth in detail below, the Complaint filed by Plaintiff Cherry Hill Construction, Inc. ("Cherry Hill") must be stayed, because such Complaint was filed prior to the exhaustion of contractually imposed disputes procedures.

## 1.    MATERIAL FACTS NOT IN DISPUTE

### A.    INTRODUCTION

On May 6, 1998, the United States, acting by and through the Department of the Interior – National Park Service (hereinafter "NPS" and/or "Owner"), awarded Grunley-Walsh an Indefinite Quantity Contract (Contract No. 1443CX305998901) (the "Contract") to stabilize and preserve the Washington Monument (the "Project"). Therefore, the Contract was modified to add certain FAR provisions, including the Changes clause (FAR 52.243-04 August 1987), the

Differing Site Conditions Clause (FAR 52.236-02 April 1986) and the Disputes clause (FAR 52.233-01 December 1998).

In accordance with the Contract, on December 5, 2003, Grunley-Walsh was issued Task Order No. T3059989135 ("Task Order No. 35"). Pursuant to Task Order No. 35, Grunley-Walsh was to construct and install an above ground security barrier system at the Washington Monument. More specifically, Grunley-Walsh was to accomplish the work contained in the Project requirements, specifications and drawings previously prepared by the Project design team, as agreed and approved by NPS.

Thereafter, on or about March 4, 2004, Grunley-Walsh entered into a subcontract with Cherry Hill to perform various construction work, including site work, site survey work, concrete work, and bollard installation work, on the Project (the "Subcontract"). A copy of the Subcontract is attached hereto as **EXHIBIT 1**.

Pursuant to 40 U.S.C. § 3131 (the "Miller Act"), Grunley-Walsh was required to provide a payment bond for the protection of all persons supplying labor and materials to the Project, in accordance with the terms of the Miller Act. Accordingly, Grunley-Walsh, together with St. Paul and Continental, as sureties, furnished a payment bond for the project, Bond No. 400SU1001/929310622 (the "Miller Act Bond"). A copy of the bond is attached hereto as **EXHIBIT 2**.

On page two of the Miller Act Bond, the following is stated under the instructions section of the bond: "This form, for the protection of persons supplying labor and material, is used when a payment bond is required under the Act of August 24, 1935, 49 Stat. 793 (40 U.S.C. 270a-270c)." This instruction specifically refers to the Miller Act which was previously codified under 40 U.S.C. 270a-270c and has now been recodified in 40 U.S.C. § 3131. As such, the Bond specifically identifies itself as a Miller Act bond.

2

### B.    CHERRY HILL'S COMPLAINT

On November 27, 2007, Cherry Hill filed a Complaint in the Circuit Court for Montgomery County against Grunley-Walsh, St. Paul, and Continental alleging breach of contract (Count I) against Grunley-Walsh, quantum meruit (Count II) against Grunley-Walsh, unjust enrichment (Count III) against Grunley-Walsh, and breach of payment bond (Count IV) against Grunley-Walsh, St. Paul, and Continental, seeking $1,351,098 in damages. See Cherry Hill's Complaint. The payment bond count in the Complaint is brought pursuant to and under the Miller Act Bond provided by Grunley-Walsh, St. Paul and Continental. See Cherry Hill's Complaint attached hereto as **EXHIBIT 3**.

On or about December 28, 2007, Grunley-Walsh, St. Paul and Continental filed a Notice of Removal of the Complaint, as the Miller Act specifically provides that any action to enforce the bond "must be brought – (A) in the name of the United States for the use of the person bringing the action; and (B) <u>in the United States District Court in which the contract was to be performed and executed</u>, regardless of the amount in controversy." 40 U.S.C. § 3133 (3) (underline added); *United States v. F.A.S. Development Co., Inc.*, 304 F. Supp.2d 1359, 1363 (N.D. Ga. 2004) (stating "federal district courts have exclusive jurisdiction over Miller Act claims"). The Defendants intend to file a Motion to Transfer the case to the United States District Court for the District of Columbia within the timeframe mandated by the Federal Rules of Civil Procedure.

### C.    GRUNELY-WALSH'S LITIGATION AGAINST NPS

As of this writing, Grunley-Walsh has filed thirteen separate appeal Complaints in the United States Court of Federal Claims against the NPS arising out of the Washington Monument Project (the "Claims"), pursuant to the Contract Disputes Act, 41 U.S.C. § 609 (a) (1). The Claims have since been consolidated into one action, styled at *Grunley--Walsh LLC, f/k/a Grunley-Walsh Construction JV v. The United States of America*, Case No. 06-721 C. The

3

Claims arise out of the denial or deemed denial of individual Certified Claims submitted by Grunley-Walsh to the Contracting Officer pursuant to 48 C.F. R. 52.233.1. Collectively, the Claims seeks an equitable adjustment of $2,036,266.19, alleging, *inter alia*, numerous owner changes, differing site conditions and additional work. Cherry Hill's claims for additional and/or changed work as well as unpaid contract work performed at the Project are part of the appeal Complaint and are specifically included within the consolidated action.

Moreover, at all times Cherry Hill acknowledged that the NPS significantly modified and/or changed the design for the Project, and that the NPS was otherwise liable for increased and additional costs to perform the work. Cherry Hill even assisted Grunley-Walsh in the preparation of the original Certified Claims and Requests for Equitable Adjustment ("REA'S") submitted to the Contracting Officer, which are now on appeal.

## D.  CONTRACT PROVISIONS SETTING FORTH THE MANDATORY DISPUTES PROCEDURES

The Subcontract sets forth the following mandatory disputes procedures:

Paragraph 17 of the Subcontract states in part (emphasis added):

> **Disputes arising out of Owner acts, omissions or responsibilities shall be resolved in accordance with the disputes procedures in the Prime Contract. Subcontractor shall have the right to exercise the Contractor's rights and shall be bound thereby. The Contractor shall have no direct liability to the Subcontractor except to give the Subcontractor the opportunity to exercise the rights in the Prime Contract.** The Subcontractor shall be required as a condition precedent to submitting a claim against the Owner to certify its claim in accordance with all certification requirements in the Prime Contract. . . . In the event that arbitration is provided for in the Prime Contract for disputes between the Owner and the Contractor, Subcontractor specifically agrees to submit its dispute arising out of said Owner acts, omissions or responsibilities in any arbitration proceeding between the Owner and the Contractor. . . . All disputes between the Contractor and Subcontractor, not involving the Owner's acts, omissions or responsibilities shall, at the Contractor's sole option be resolved in arbitration in accordance with the rules of the American Arbitration Association.

Paragraph 15 of the Subcontract states in part (emphasis added):

4

> **Changes ordered by Owner shall be performed and paid for in accordance with the terms of the Prime Contract, including all rights of dispute and appeal, provided reservation and exercise of said rights do not interfere with the progress of the work. Payment for Owner changes shall be made in accordance with Paragraph 5, Price and Payment, and payment for Owner changes shall not be due the Subcontractor as a specific condition precedent until the Contractor from the Owner receives said payment.**

Paragraph 5 of the Subcontract states in part (emphasis added):

> **The Subcontract price shall be paid in partial payments, when received by the Contractor from the Owner, to Subcontractor for the payment for work in place and material on jobsite. Payment from the Owner is a specific condition precedent to the Contractor's obligation to pay the Subcontractor, the risk of nonpayment by the Owner being on the Subcontractor for its portion of the work in place or material on the job site.**
>
> ...
>
> **Final payment shall be due after completion of all work, acceptance by the Owner, compliance with all Subcontract obligations, and receipt of final payment from the Owner, which items shall be conditions precedent to the making of final payment to Subcontractor.**

The Subcontract provisions set forth above specifically refer to the disputes procedures in the prime contract. Grunley-Walsh's contract with the Owner incorporates the Federal Acquisition Regulation ("FAR") disputes clause, 48 C.F. R. 52.233.1 (the "FAR Disputes Clause"). The FAR Disputes Clause states in part:

> (a)  This contract is subject to the Contract Disputes Act of 1978, as amended (41 U.S. C. 601-613).
>
> (b) Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved under this clause.
>
> (c) Claim, as used in this clause, means a written demand or written assertion by one of the contracting parties seeking as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract. However, a written demand or written assertion by the Contractor seeking

the payment of money exceeding $100,000 is not a claim under the Act until certified. . . .

(d) (1)  A claim by a Contractor shall be made in writing and, unless otherwise stated in this contract, submitted within 6 years after accrual of the claim to the Contracting Officer for a written decision. . . .
 . . . .
(e)     . . . . For Contractor-certified claims over $100,000, the Contracting Officer must, within 60 days, decide the claim or notify the Contractor of the date by which the decision will be made.

41 U.S.C. §§ 601-613 (the "Contract Disputes Act"), states in part:

1) Except as provided in paragraph (2), and in lieu of appealing the decision of the contracting officer under section 605 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary.

## 2.    LEGAL AUTHORITY IN SUPPORT OF MOTION

### A.    UNDER THE SUBCONTRACT, GRUNLEY-WALSH, AND BY EXTENSION THE SURETIES, HAVE NO LIABILITY TO CHERRY HILL FOR OWNER ACTS UNLESS THE OWNER IS ULTIMATELY DETERMINED TO BE LIABLE AND PAYS FOR CHERRY HILL'S DAMAGES

The Subcontract conclusively establishes that payment to Cherry Hill is not due unless and until Grunley-Walsh receives payment from the Owner.  Subcontract Paragraph 5.  In *Gilbane Bldg, Co. v. Brisk Waterproofing Co., Inc.*, 86 Md. App 21, 585 A.2d 248 (1991), the Court of Special Appeals, enforcing Maryland's longstanding principle of objective contract interpretation, held that the subcontractor's claim was barred because the receipt of payment by the general contractor from the owner - a required "condition precedent" - had not been satisfied. As such, the general contractor's obligation to pay the subcontractor had not yet accrued. *Id.* at 28.

Similar to the subcontractor in *Gilbane*, Cherry Hill's Complaint does not allege, and there is no dispute in this regard, that Grunley-Walsh has not received payment from the Owner for Cherry Hill's claims - the required condition precedent of the Subcontract.  As a

6

consequence, Cherry Hill cannot institute legal action of its claims under the Subcontract. Based on the clear language of the Subcontract, Cherry Hill's claims to this Court should be stayed until it can demonstrate satisfaction of the condition precedent.

Moreover, Cherry-Hill's Subcontract provides that "[d]isputes arising out of Owner acts, omissions or responsibilities shall be resolved in accordance with the disputes procedures in the Prime Contract." Subcontract Paragraph 17. Both Grunley-Walsh and Cherry Hill agreed at the time of discussing the REA's to be submitted to the Contracting Officer that the changed and additional work was caused by the Owner and that Cherry Hill's claims would be included in the REA's to the Owner.

The Subcontract also specifically states that Grunley-Walsh "shall have no direct liability to [Cherry Hill] except to give [Cherry Hill] the opportunity to exercise the rights in the Prime Contract." Subcontract Paragraph 17. Grunley-Walsh's contract with the Owner incorporates the FAR Disputes Clause, and the Contract Disputes Act, which requires the submittal of certified claims to the Contracting Officer and the right to sue upon the denial thereof. The contract disputes procedures of the prime contract were specifically incorporated into the Subcontract to prevent Cherry Hill from filing suit against Grunley-Walsh and its sureties for claims involving the Owner at the same time that Grunley-Walsh was pursuing the identical claim(s) against the Owner on Cherry Hill's behalf.

Thus, as a matter of law, Cherry Hill cannot pursue its claims against Grunley-Walsh and the Sureties until the disputes procedure between Grunley-Walsh and the Owner is concluded. As such, on the basis of the Subcontract's specific incorporation of the prime contract's disputes procedure, Cherry Hill's Complaint should be dismissed, without prejudice or, at a minimum, stayed until such time as the litigation between Grunley-Walsh and the NPS is concluded.

As shown by the foregoing, based on the Subcontract, at this time, Cherry Hill is not entitled to any amount for its claimed damages because Grunley-Walsh has fulfilled its

contractual obligations in passing Cherry Hill's claim on to the Owner, first in a certified claim

to the Contracting Officer, and then further as a Complaint in the United States Court of Federal

Claims. Unless and until the Owner is found to be liable for Cherry Hill's alleged damages, then

Grunley-Walsh and its sureties have no liability to Cherry Hill for its claims.

## B.    CASE LAW SUPPORTING A STAY

In *Seal & Co., Inc. v. A.S. McGaughan Co., Inc.*, 907 F.2d 450, 454 (4th Cir. 1990), the

Court of Appeals for the Fourth Circuit found:

> The general rule is that parties are free to contract for dispute resolution
> procedures which, in effect, turn breach of contract claims into claims for
> relief under the contract. *See United States v. Utah Constr. & Mining Co.*,
> 384 U.S. 394, 404, n. 6, 86 S.Ct. 1545, 1551, n. 6, 16 L.Ed.2d 642 (1966).
> Parties are bound to exhaust such procedures unless they are "inadequate
> or unavailable," as, for example, where the Contracting Officer or the
> Appeals Board is unwilling to act. *United States v. Grace & Sons*, 384
> U.S. 424, 430, 86 S.Ct. 1539, 1543, 16 L.Ed.2d 662 (1966). In addition,
> the "inadequacy or unavailability of administrative relief must clearly
> appear before a party is permitted to circumvent his own contractual
> agreement." *Id.*

The United States District Court for the District of Columbia, just three months ago,

citing the *Seal* decision, faced the very question posed in this Motion. *Norment Security Group,*

*Inc. v. Travelers Casualty and Insurance Company*, 505 F.Supp.2d 97, 104-05 (D.D.C. 2007).

In *Norment*, a glass and glazing subcontractor (PCC) filed a counterclaim against the general

contractor (Centex) in part for delay costs caused by Centex and/or the GSA (Count III). *Id.* at

104. Centex moved to stay the delay costs count of the counterclaim "on the grounds that PCC

is required to specific terms of its subcontract with Centex to wait until the contractually

prescribed dispute resolution procedures with GSA have been exhausted before seeking

reimbursement for delay costs from Centex." *Id.*    The Court ruled on the Motion as follows

(internal citations and quotation marks omitted):

> Thus, according to Centex, PCC must await resolution of Centex's claims,
> including that at issue here submitted by PCC, with GSA before PCC can
> assert a claim against Centex due to GSA's delay and subsequent non-

8

payments to PCC. On the other hand, PCC argues that staying the claim would only delay complete adjudication for the claims now pending before the Court. This is hardly a basis for the Court to abrogate the binding agreement that the parties entered into voluntarily, and PCC provides no other basis for the Court to do so. Moreover, PCC does not address the possibility that the same claim could be resolved two different ways, one by the GSA and the other by this Court.

PCC's claim for damages caused by delay arises under the contract, and because GSA—the relevant administrative agency—has not yet ruled on Centex's claim, which includes PCC's claim, then PCC's prosecution of the very same claim should await the GSA's determination. Centex's request to stay Count III of the counterclaim will therefore be granted.

*Id.* at 105.

Based on *Seal* and *Norment*, Cherry Hill's claim should be stayed pending the disposition of Grunley-Walsh's litigation with the NPS.

Case law also supports the stay of the Miller Act suit pending completion of dispute procedures. In a case similar to the one *sub judice*, the United States District Court for the District of Maryland ruled that it was within the discretion of the court to stay a Miller Act claim against the payment bond surety while the subcontractor and general contractor resolved their dispute via alternative dispute resolution. *See, United States f/u/b/o MPA Constr., Inc. v. XL Specialty Ins. Co.*, 349 F.Supp.2d 934 (D. Md. 2004). There, as here, a subcontractor brought an action against a payment bond surety under the Miller Act. The general contractor moved to stay the matter pending arbitration with the subcontractor as explicitly required under their subcontract. *See also United States v. Dick/Morganti*, 2007 WL 3231717, \*2-\*4 (N.D. Cal. 2007) (staying subcontractor's Miller Act claim against the surety pending completion of the general contractor's claim with the GSA); *United States v. David Boland, Inc.*, 922 F. Supp. 597, 598-99 (S. D. Fla. 1996) (dismissing subcontractor's Miller Act claim against general contractor and surety without prejudice to pursue the remedies provided for in the contract between the parties); *United States v. Daniel, Urbahn, Seelye and Fuller*, 357 F. Supp. 853,  860-862 (N.D.

9

Ill. 1973) (staying subcontractor's Miller Act claim against prime contractor pending outcome of

disputes clause proceeding).

The Court in the *Dick/Morganti* case discussed the legislative history of the statute

regarding waiver of Miller Act rights (40 U.S.C. §3133 (c)). In doing so, the Court found that

Congress had explained in the legislative history for the Miller Act that it was not intended to:

> void subcontract provisions requiring arbitration or other alternative
> methods of resolving disputes. Such provisions would remain enforceable
> with a claimant's Miller Act rights preserved by a timely suit that can be
> stayed pending the outcome of the subcontract dispute resolution
> procedure. The bill respects the freedom of the parties to the subcontract
> to specify means to resolve their disputes and the exclusive jurisdiction of
> the district court to decide issues arising under the Miller Act.

*Dick/Morganti, supra* at \*3.

In another recent decision, *United States v. Bencor-Petrifond*, 2007 WL 1725468, \*1-\*3

(N.D. Ill. 2007), the Court addressed whether a Miller Act suit should be stayed while the

subcontractor's claim against the general contractor was arbitrated. In *Bencor*, the Court said:

> In this case, the [subcontractor's] claims against [the sureties] necessarily
> depend on whether [the general contractor] breached its subcontract with
> [the subcontractor]. The liability of the sureties ... is limited to the
> liability of the principal. The extent of that liability will be determined by
> arbitration, and there is no reason to duplicate the determination here. To
> do so would risk inconsistent rulings. Also [the subcontractor] does not
> give any reason to think it would suffer hardship by a stay of its Miller Act
> claims. The court in *United Sates ex re. MPA Construction v. XL
> Specialty Insurance Co.*, 349 F. Supp.2d 934 (D. Md. 2004), addressed
> this issue. In that case, the court noted that delay from staying the Miller
> Act claims was speculative and unlikely. If a plaintiff wins arbitration, it
> still does not need to litigate its Miller Act claims unless the principal does
> not pay the arbitration award. *Id.* at 942.

*Bencor*, 2007 WL at \*3.

Here, Grunley-Walsh's liability (and the Sureties liability) to Cherry Hill, if any, can only

be determined through completion of the disputes resolution procedure with the Owner. There is

no reason to think Cherry Hill will suffer any hardship by a stay of its Miller Act suit because it

cannot collect anything until a determination is made as to whether the Owner is liable for

Cherry Hill's claims. If Grunley-Walsh prevails in its litigation against the NPS, then Cherry Hill will not need to litigate its Miller Act claim.

Moreover, Cherry Hill agreed to limit its recovery for owner caused changes to that amount Grunley-Walsh collects through the disputes procedure in its contract with the NPS. To allow Cherry Hill to proceed in this action may require the parties to litigate in a piecemeal fashion and could well result in multiple trials before different federal courts regarding the same issues which could have inconsistent results. Considerations of judicial economy warrant dismissing Cherry Hill's Complaint, without prejudice, until a final disposition is made with regard to Grunley-Walsh's litigation against the Owner. In the alternative, all proceedings in this action should be stayed until that time.

## CONCLUSION

Based on the foregoing, Grunley-Walsh, St. Paul and Continental respectfully request this Court dismiss Complaint, or in the alternative, stay all proceedings in this case pending the exhaustion of contractually mandated disputes procedures.

Respectfully submitted,

**HUDDLES & JONES, P.C.**

BY:     /s/ Nicole L. Campbell
        Nicole Lefcourt Campbell, Federal Bar #: 14336
        10211 Wincopin Circle, Suite 200
        Columbia, Maryland 21044
        (301) 621-4120 (Telephone)
        (301) 621-4473 (Facsimile)
        campbell@hjpc.com

        Attorneys for Defendants,
        Grunley-Walsh, LLC (formerly known as
        Grunley-Walsh Joint Venture, LLC),
        St. Paul Fire and Marine Insurance Company and
        The Continental Insurance Company

11

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on the 4th day of January, 2008, a copy of the foregoing

Memorandum In Support of Defendants' Motion to Dismiss, or in the Alternative, to Stay Pending

Exhaustion of Mandatory Dispute Procedures, was transmitted via facsimile and mailed, postage

prepaid, to:

> Joseph C. Kovars, Esquire
> Jay Bernstein, Esquire
> Ober, Kaler, Grimes & Shriver
> A Professional Corporation
> 120 E. Baltimore Street
> Baltimore, MD  21202-1643
> (410) 685-1120 (Phone)
> (410) 547-0699 (Facsimile)

> _/s/ Nicole L. Campbell_ ___
> Nicole Lefcourt Campbell

*Subcontract #03096CHER001*

## Grunley-Walsh                                    SUBCONTRACT AGREEMENT

SUBCONTRACT AGREEMENT MADE BETWEEN

THE CONTRACTOR:____GRUNLEY-WALSH JOINT VENTURE, LLC_____ AND

THE SUBCONTRACTOR:____CHERRY HILL CONSTRUCTION_____

ADDRESS_____8211 WASHINGTON BLVD JESSUP MD. 20791-0356_____

PHONE No.:___(410) 799-3577_____ FAX No.:___(410)799-5483_____

---

**1. THE PROJECT**

G-W JOB NO.      01096          JOB INFO PACKAGE ENCLOSED:  Yes  X
COST CODE        02-100         NTP
CONTRACT NO.     1443C059980001  Task Order No. 35 – Mobilization Phase
OWNER            National Capitol Parks-Central
JOB NAME         Washington Monument Design and Construction
LOCATION         Washington Monument, Washington DC

---

### SCOPE OF WORK

2.   Subcontractor warrants that it is thoroughly familiar with the site conditions and the Prime Contract Documents and that the Subcontractor shall furnish anything necessary to complete in place the work to complete in place the Site Work/Site Survey/concrete/Bollards /Add Alternated List work as set forth below in strict accordance with the Prime Contract Documents including plans, specifications, attachments, general provisions, general and special conditions.

**INCLUDES:**
*   Add Alternate #4 – Concrete Wall, Add Alternate #5 – Concrete Paving, Add Alternate #10 Crowd control sockets and Concrete Light Vaults.
*   Quantity deduction of the slot drains and light vaults shall be negotiated with Cherry Hill Contracting.
*   ~~This is a firm fixed no change order contract~~   * See below.

Grunley-Walsh reserves the exclusive and sole right to exercise all remaining contract options as described in the prime contract documents and as listed below:

<None>

Also included are all security and safety requirements, compliance with federal, state and local regulations, OSHA and the National Park Services regulations, submittal of certified. Payroll, submittals, samples, surveys, transportation of your personnel, materials and equipment, coordination with Grunley-Walsh Joint Venture and other trades, participation in scheduling, protection of existing elements and quality control.

### Flow-Down Relationship

3.   The Subcontractor is bound to the Contractor in the same way the Contractor is bound to the Owner and shall assume toward the Contractor all the obligations and responsibilities which the Contractor assumes toward the Owner and shall have the benefit of all rights, remedies and redress against the Contractor, pursuant to the Prime Contract, has against the Owner, except that this Subcontract shall govern any inconsistent provision of the Prime Contract.

### THE SUBCONTRACT SUM

4.   The Contractor shall pay the Subcontractor for the performance of this *Subcontract Six Million Fifty Four Thousand Eight Hundred Fifty Nine Dollars /zero cents ($6,054,859.00)* in partial payments as hereinafter described.

\* Subcontractor shall work diligently with the Contractor to minimize the cost to the Contractor due to changes in the work being performed by the Subcontractor. The Subcontractor is not and was not a part of the design phase of this project, therefore, additive and deductive change orders will be negotiated. This paragraph supersedes Article 3, Flow-Down Relationship, where applicable, i.e. design/build.

```
EXHIBIT

   1
```

*Subcontract #03096CHER001*

### Price And Payment

5. The Subcontract price shall be paid in partial payments, when received by the Contractor from the Owner, to Subcontractor for the payment for work in place and material on jobsite. Payment from the Owner is a specific condition precedent to the Contractor's obligation to pay the Subcontractor, the risks of nonpayment by the Owner being on the Subcontractor for its portion of the work in place or material on the job site. Ten percent (10%) retention shall be withheld until final payment is due except that retainage will be reduced when and to the extent the Owner's retainage withheld from the Contractor is reduced. Final payment shall be due after completion of all work, acceptance by the Owner, compliance with all Subcontract obligations, and receipt of final payment from the Owner, which items shall be conditions precedent to the making of final payment to Subcontractor. The Contractor is entitled to proof of payment for labor, material and services used before any payment is due. Material paid for shall belong to the Contractor, but shall remain in the care, custody and control of Subcontractor and be stored at Subcontractor's risk. The Subcontractor shall be responsible at all times for his labor and/or materials until same is accepted by the Owner. Subcontractor shall furnish guarantees and all other documents required by the Prime Contract for the Subcontractor's work, including releases of all claims and liens as a condition precedent for final payment. Partial releases may be required at the Contractor's option as a condition precedent to any partial payments for work completed and the Contractor may require the Subcontractor to certify and/or exhibit such other evidence that all entities furnishing labor, materials, and equipment under prior requisitions have been paid in full. Liquidated damages withheld by Owner will be assessed against Subcontractor for delay attributable to Subcontractor's fault. The Subcontractor shall itemize the Subcontract price as a basis for establishing value of work completed, and partial payments. Subcontractor agrees that it will not be paid by the Contractor for work and materials in place until ten (10) days after the Contractor's receipt of payment from the Owner. If the Contractor withholds making payment to the Subcontractor until the Subcontractor has complied with the aforesaid terms and conditions, the Subcontractor shall still diligently proceed with the work as required.

### Liability And Indemnity Insurance

6. The Subcontractor shall procure, at its sole cost and expense, the insurance coverages set forth below, and shall maintain such coverages in full force and effect as specified in this Paragraph. The Subcontractor shall include the Contractor [Grunley-Walsh] as an additional insured to the insurance policies described below. The insurance coverage afforded under the policies described herein shall be primary and non-contributing with respect to any insurance carried independently by the Contractor. All such insurance policies shall indicate that as respects the insured (whether named or otherwise), cross liability and severability of interests shall exist for all coverage's provided there under. In addition, all such insurance policies shall include a waiver of subrogation endorsement in favor of the additional insured. The insurance specified below shall be placed with insurance companies reasonably acceptable to Contractor, shall be written on an occurrence basis, and shall incorporate a provision requiring the giving of notice to Contractor at least thirty (30) days prior to the cancellation, non-renewal or material modification of any such policies. The Subcontractor shall promptly furnish the Contractor with certificates of insurance evidencing the insurance required hereunder, and shall not commence any services under this Agreement until such insurance is obtained.

(i) Commercial General Liability Insurance. A broad form Commercial General Liability Insurance Policy in form and substance reasonably acceptable to the Contractor and including, without limitation, appropriate endorsements adding the following coverages: Premises and Operations Liability; Explosion, Collapse and Underground Damage Liability; Personal Injury Liability (with employee and contractual exclusions deleted); Broad Form Property Damage Liability; Contractual Liability supporting the Contractor's indemnification agreements in this Contract; Completed Operations and Products Liability for a period of not less than three (3) years following the Contractor's acceptance of the Project; and Independent Contractor's Protective Liability. The Commercial General Liability Insurance Policy must be written with a combined single limit of liability of not less than $1,000,000 for each occurrence of bodily injury and/or property damage and an annual aggregate of liability per project of not less than $2,000,000 for bodily injury and/or property damage, and an annual aggregate of liability of not less than $2,000,000 for Completed Operations and Products Liability.

(ii) Comprehensive Automobile Liability Insurance. A Comprehensive Automobile Insurance Policy in form and substance reasonably acceptable to the Contractor [Grunley-Walsh]. The Comprehensive Automobile Liability Insurance Policy must provide coverage for all owned, hired, rented and non-owned automobiles, and must be written with a combined single limit of liability of not less than $1,000,000 for each occurrence of bodily injury and/or property damage.

(iii) Worker's Compensation Insurance. A Worker's Compensation Insurance Policy in form and substance reasonably acceptable to the Contractor and in an amount not less than the statutory limits (as may be amended from time to time), including Employees Liability Insurance with limits of liability of not less than (i) $500,000 for bodily injury by accident, each accident, (ii) $500,000 for bodily injury by disease, each employee, and (iii) $500,000 aggregate liability for disease.

(iv) Property Insurance. A Property Insurance Policy covering all materials, equipment and other portions of the Work stored off-site or in transit; it being expressly acknowledged and agreed by the Contractor that it shall assume responsibility for any loss or damage to such property.

(v) Umbrella Liability Insurance. An Umbrella Liability Insurance Policy in form and substance reasonably acceptable to the Contractor [Grunley-Walsh] written in excess of the coverages provided by the insurance policies described above in subsections (i),(ii) and the Employer's Liability in (iii). The Umbrella Liability Insurance Policy must be written with a combined single limit not less than $5,000,000 for each occurrence of bodily injury and/or property damage, and an annual aggregate of liability of not less than $5,000,000 for bodily injury and/or property damage.

The Contractor shall not insure nor be responsible for any loss or damage to tools, equipment or other property of any kind owned, rented or leased by the Subcontractors, sub-subcontractors, or their respective employees or agents.

2

To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Owner, Contractor, Architect, Architect's consultants and agents and employees of any of them from and against all injuries, claims, damages, losses and expenses, including but not limited to attorney's fees, arising directly or indirectly out of the obligations herein undertaken or resulting out of operations conducted by the Subcontractor, the Subcontractor's Sub-subcontractors, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such injury, claim, damage, loss or expenses is caused in part by a party indemnified hereunder, save and except claims or litigation caused by or resulting from the sole negligence of the party indemnified hereunder.

### Bonds <Not Required for this contract from Grunley-Walsh>

7.  The Subcontract shall furnish performance and payment bonds in a form satisfactory to the Contractor and in the Department of the Treasury's approved sureties list, in an amount equal to the Subcontract sum, which bonds shall carry the surety's consent to changes in price and time of performance necessary to conform to Prime Contract requirements. Furnishing of said bonds shall be a condition precedent to the Contractor's obligation to release partial payments.

### Shop Drawings, Samples, And Data Submissions

8.  All submittals such as shop drawings, catalogs, samples and material lists required by Prime Contract, which pertain to this work, shall be furnished in a complete and timely manner. Subcontractor shall be responsible for delays because of failure to do so and for any deviation from plans and specifications. All deviations from the Prime Contract documents must be noted clearly on the submittals, and by separate cover letter the Subcontractor shall state reasons for the deviation and refer to the applicable contract provision. The complete set of submissions for this Subcontract work shall be submitted by the Subcontractor to the Contractor within thirty (30) days from the date of this Subcontract, unless otherwise stated in the Contractor's Schedule of Progress. Approval by the Owner or the Contractor does not constitute a waiver or modification of the Prime Contract requirements.

### Time Is Of The Essence

9.  Time is of the essence. The Contractor has the right to direct the manner in which the Subcontractor performs its work. Subcontractor shall proceed with the performance of the work at such time and in such sequence as the Contractor may direct and/or as required by the Schedule of Progress, which may be updated and revised from time to time by the Contractor as working conditions require, including overtime or shift work performance as necessary. If overtime or additional shifts are required solely to accelerate project completion through no fault of the subcontractor, it shall be authorized in writing prior to such acceleration effort and be paid for by the Contractor. Payments due may be withheld to insure timely progress and completion of work. The Subcontractor shall be liable for all losses and damages incurred by the Contractor (including consequential damages) due to inexcusable delays of the Subcontractor in the performance of the work, including delay costs not reimbursable from the Owner due to concurrent, inexcusable delays of the Subcontractor.

### Extensions Of Time

10.  Subcontractor shall be entitled to an extension of time for performing and completing the work covered by this subcontract upon the same terms and conditions an extension of time is allowable under the Prime Contract, and only to the extent that an extension of time is actually granted to the Contractor by Owner, or its representative under the Prime Contract. The Subcontractor shall give notice of the excusable delays to the Contractor in writing within three (3) calendar days from the beginning of said delay in order that the Contractor may in turn notify the Owner. If notice is not given timely, said excusable delay may be considered waived. The Owner's decision, or its representative's, with regard to the delay, including the assessment of liquidated damages, shall be binding upon and chargeable to the Subcontractor, subject to the disputes procedure provided in the Prime Contract.

### Damages For Delay

11.  The Contractor shall not be independently liable to Subcontractor for any unforeseeable delay or interference occurring beyond the Contractor's control or for delay or interference caused by Owner or other subcontractors or suppliers. Subcontractor shall only be entitled to reimbursement for any damages for delays recovered on its behalf by the Contractor from the Owner or others. The Subcontractor shall have the right, at its expense, to exercise all provisions of the Prime Contract to recover said damages against the Owner. In the event that the Contractor seeks to recover damage for delay against the owner or others and the Subcontractor participates in such claim, the Subcontractor shall be responsible for its pro rata share of any legal expert or other expenses in presenting and/or prosecuting the overall claims. The Contractor shall have the right, at any time and for any reason, to delay or suspend the whole or any part of the work herein. A time extension shall be the sole and exclusive remedy of the Subcontractor for delays or suspensions caused by Contractor, even if the delays or suspensions were: (1) of a kind not contemplated by the parties, (2) amounted to an abandonment of the contract, or (3) were caused by active interference.

### Schedule

12.  The Contractor may schedule this project using CPM Schedule techniques and/or simple bar charts. Subcontractor agrees to meet with the Contractor and to provide the necessary detailed information to properly depict activities, including their costs and duration, at no additional cost to the Contractor. All such data shall be provided within fifteen (15) days of the Contractor's written notice and request. The Contractor may at its option withhold making payments to the Subcontractor until the Subcontractor has provided said information. The Contractor may modify and change the schedule from time to time as it deems appropriate in accordance with actual performance conditions. Subcontractor shall perform the work as directed by such schedules as expeditiously as possible despite any pending disputes.

### Default Termination

13.  The following events determined by the good faith judgment of the Contractor shall be deemed a breach of this Agreement by the Subcontractor: Failure to expeditiously prosecute and complete the whole or any part of the work in accordance with the current Schedule of Progress and/or directions from the Contractor, failure to pay for labor and material, payroll taxes, contributions or insurance premiums; interference with the performance of work by others for any reason; an act of bankruptcy or insolvency; or any other material failure to fulfill obligations of this Subcontract or of the Prime Contract concerning the Subcontractor's work or responsibilities. If the Subcontractor

3



*Subcontract #03096CHER001*

breaches the Subcontract, the Contractor may terminate Subcontractor's right to proceed upon three (3) days written notice. In the event that the Contractor believes in good faith that the work is being endangered by the Subcontractor's failure to prosecute the work or take action, such written notice may be omitted and the Subcontractor's performance in whole or in part may be immediately terminated. The Contractor may then have the work completed and may use Subcontractor's material, supplies, ~~tools and equipment~~ to complete. Subcontractor and its surety shall continue to be liable for all costs to complete and any damages and expenses including reasonable counsel fees, liquidated damages assessed by owner and other liabilities which may result from the default and breach, without waiver of any other rights or remedies available to the Contractor, including right of setoff and collection of any funds which may be due Subcontractor under other subcontracts with the Contractor. If the Contractor wrongfully exercises its default option under this Article, the Subcontractor's remedy shall be solely and exclusively under Article 27, Termination for Convenience.

The Subcontractor agrees that in the event the Contractor is terminated for default by the Owner, all disputes relating to or arising out of the Subcontract shall be stayed pending the final resolution of the Contractor's termination for default in accordance with the administrative and/or judicial disputes procedures in the prime contract. The Subcontractor further agrees that all payment bond actions by the Subcontractor against the Contractor shall be stayed pending the final resolution of the Contractor's termination for default. In the event that the Owner's termination for default of the Contractor is upheld, the Subcontractor agrees that the amount of any recovery the Subcontractor is entitled to from the Contractor shall be limited to the recovery allowed pursuant to Article 27, Termination for Convenience.

## Extra Work

14. The Contractor may at any time direct the Subcontractor to perform extra work or changes under this Subcontract. Only extra work authorized by the Contractor as an extra or change in writing shall be paid for by the Contractor. If the extra work direction does not originate from Owner's direction and there is no prior agreement on price, then Subcontractor shall be paid for the actual direct costs of said work plus fifteen percent (15%) for overhead, profit, supervision and small tools, which will constitute the entire amount due the Subcontractor for the extra work, including any impact or delay effect.

## Owner Changes

15. Changes ordered by Owner shall be performed and paid for in accordance with the terms of the Prime Contract, including all rights of dispute and appeal, provided reservation and exercise of said rights to not interfere with the progress of the work. Payment for Owner changes shall be made in accordance with Paragraph 5, Price and Payment, and payment for Owner changes shall not be due the Subcontractor as a specific condition precedent until the Contractor from the Owner receives said payment.

## Contract Interpretation

16. The Contractor's interpretation of contract requirements shall be binding upon Subcontractor and complied with, except that Subcontractor shall have the right to claim adjustment of the contract because of said interpretation, if said claim is made in writing within forty-eight (48) hours after ruling and direction.

## Disputes

17. Disputes arising out of Owner acts, omissions or responsibilities shall be resolved in accordance with the disputes procedures in the Prime Contract. Subcontractor shall have the right to exercise the Contractor's rights at the Subcontractor's sole cost and shall be bound thereby. The Contractor shall have no direct liability to the Subcontractor except to give the Subcontractor the opportunity to exercise the rights in the Prime Contract. The Subcontractor shall be required as a condition precedent to submitting a claim against the Owner to certify its claim in accordance with all certification requirements in the Prime Contract. Subcontractor agrees to indemnify and hold harmless the Contractor for any defects or misrepresentations in its certifications, including any relating to cost or pricing data. In the event that arbitration is provided for in the Prime Contract for disputes between the Owner and the Contractor, Subcontractor specifically agrees to submit its disputes arising out of said Owner acts, omissions or responsibilities in any arbitration proceeding between the Owner and the Contractor. Subcontractor shall be given the opportunity to confer with the Contractor in the selection of arbitrators, unless the dispute is solely one between the Owner and Subcontractor, in which event the Subcontractor may make the selection of arbitrators in the Contractor's name. All disputes between the Contractor and Subcontractor, not involving the Owner's acts, omissions or responsibilities shall, at the contractor's sole option, be resolved by arbitration in accordance with the rules of the American Arbitration Association. Subcontractor specifically agrees that any such arbitration proceedings shall, at the Contractor's sole option, be consolidated with any arbitration proceedings between the Contractor and any other party.
Subcontractor specifically agrees that any dispute with the Owner or the contractor shall not interfere with Subcontractor's progress of its work in any manner, and that Subcontractor shall proceed with its work as ordered, subject to claim. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. The award rendered by the arbitrators shall be final, and judgment may be entered upon it in any court having jurisdiction thereof. Any such award shall be binding and enforceable against any persons, surety and/or bonding company, which guarantee the performance by the Subcontractor of this Agreement in any manner.

## Backcharges

18. All charges and backcharges assessed by the Contractor against the Subcontractor shall be deemed accepted by Subcontractor unless rejected in writing within thirty (30) days. The Contractor is authorized to deduct and offset from any payments due Subcontractor an amount equal to any and all sums, obligations, liabilities, backcharges, claims (liquidated or unliquidated) owed by Subcontractor to Contractor arising under this Subcontract or any other contract or agreement between the Subcontractor and the Contractor.

## Plant And Cleanup

19. Subcontractor shall provide its own plant and facilities, including scaffolding and hoists, do its own cleanup, and repair or replace damaged, defective and defaced work caused by its own negligence. The Subcontractor shall cleanup and remove from the site all of its rubbish, debris, etc. on a daily basis, unless the Contractor directs otherwise. Upon completion of the subcontract work, all Subcontractor's materials, equipment, etc. must be immediately removed from the jobsite by Subcontractor. Failure to comply will permit the Contractor to do so and backcharge Subcontractor for the cost. If Subcontractor uses the Contractor's hoist, scaffolding or facilities, it will be responsible for the

4

operating expenses of such equipment when in use for Subcontractor's benefit.

## Bankruptcy And Delinquent Taxes

20. In the event of any act of bankruptcy insolvency by the Subcontractor or notice of levy involving delinquent taxes owed by Subcontractor, the contractor shall have the right to withhold payments and apply the same to secure performance of the Subcontract without prejudice to all other rights against Subcontractor or its surety.

## Responsibility For Work In Place

21. The Subcontractor shall check all work performed by others necessary to "receive" the Subcontractor's work. Failure to give notice of any discrepancy shall relieve the Contractor of any responsibility therefore. The Subcontractor shall be responsible for all field measurements and shall check elevations and grades to insure proper fitting of its work. It shall not be incumbent upon the Contractor to discover any mistakes, errors, omissions or deviations from the contract requirements in the subcontract drawings, and the Owner's final approval of drawings made by the Subcontractor shall not relieve the Subcontractor from responsibility for unauthorized changes, deviations or omissions or for error of any sort in its drawings.

## Licenses And Fees

22. Subcontractor shall be responsible for all taxes, permits, licenses and fees necessary to perform its work, including any increase therein, if any, during the life of the Subcontract.

## Labor Force

23. Subcontractor shall be responsible for performance regardless of any interference of any trades council or other labor or union organization. Any work stoppage by employees which will in the opinion of the Contractor unreasonably delay the work will be a breach of the Subcontract subject to the rights set forth in Paragraph 13. The Subcontractor shall immediately remove from the work such of his employees as the Contractor shall deem incompetent, careless, insubordinate or otherwise undesirable. The Subcontractor shall employ at all times a sufficient number of workmen with sufficient equipment and proper materials which in the opinion of the Contractor shall be required to prosecute the work in a diligent and expeditious manner.

## Nondiscrimination

24. Subcontractor shall not discriminate against any employee or applicant for employment, advancement, transfer, layoff or termination because of race, religion, color, sex or national origin. All Equal Opportunity or affirmative action requirements of the Prime Contract shall be obligations of the Subcontractor, including:

Executive Order 11246, As Amended

Part II - Nondiscrimination in Employment by Government Contractors and Subcontractors: Subpart B - Contractors' Agreements:

SEC. 202. During the performance of this contract, the subcontractor agrees as follows:

(1) The subcontractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The subcontractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The subcontractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2) The subcontractor will, in all solicitations or advancements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

(3) The subcontractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The subcontractor will comply with all provisions of Executive Order No. 11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The subcontractor will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of the subcontractor's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated, or suspended in whole or in part and the subcontractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The subcontractor will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The subcontractor will take such action with respect to any subcontract or purchase order as may be directed by the Secretary of Labor as a means of enforcing such provisions including sanctions for noncompliance: Provided, however, that in the event the subcontractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction, the subcontractor may request the United States to enter into such litigation to protect the interests of the United States."

5

*Subcontract #03096CHER001*

### Superintendence

25. Subcontractor shall employ full-time on the jobsite a competent Superintendent, satisfactory to the Contractor with full authority to act on Subcontractor's behalf. The Contractor shall have the right to require the Subcontractor to replace the Superintendent if, in the opinion of the Contractor, the Subcontractor's Superintendent is not satisfactorily performing the work.

### Patent Infringement

26. Subcontractor shall indemnify the Contractor from any use or infringement of patents.

### Termination For Convenience

27. Contractor shall have the right to terminate this Agreement for its own convenience for any reason by giving notice of termination effective upon receipt thereof by Subcontractor. Termination for default under Paragraph 13, if wrongfully made, shall be treated as a termination for convenience. Settlement with the Subcontractor shall be accomplished in accordance with the provisions of the Termination for Convenience clause in the Prime Contract. If the Termination for Convenience clause in the Prime Contract is not applicable, the Subcontractor shall only be paid either the actual cost for work and labor in place, plus fifteen percent (15%), or a pro rata percentage of the Subcontract amount equal to the percentage of completion for the Subcontractor's work as approved by the Contractor, whichever is less. Subcontractor shall not be entitled to anticipated profits on unperformed portions of the work

### Assignment

28. No assignment hereunder, including an assignment of proceeds due or to become due to the Subcontractor is allowed without prior written approval of the Contractor.

### Notices

29. All notices required under this Subcontract or the Prime Contract shall be addressed to Contractor's office located at 11910 Parklawn Dr., Suite U, Rockville, MD 20852. Notices required by the various provisions of the Prime Contract (not otherwise dealt with herein) shall be due in the Contractor's office in one-half (½) the time specified in the Prime Contract so that Contractor will have sufficient time to forward its notice within the required period. Failure of Subcontractor to forward notices in a timely manner as required by the various equitable adjustment provisions of the Prime Contract shall operate to waive its rights to any such adjustments if the Owner rejects the claim.

### Owner Approval

30. This Agreement is contingent upon Subcontractor or its product being approved by the Owner. If a disqualification occurs because of failure to comply with and strictly fulfill the obligations herein, said failure shall be deemed a breach by the Subcontractor. Any other rights of disqualification by Owner shall render this Agreement null and void.

### Recitation, Severability, And Waiver

31. Attachments are part of this Agreement. If this Agreement is retained by Subcontractor without executing and returning same within fifteen (15) days, it shall be deemed accepted; however, acceptance in writing is a condition precedent to payment due hereunder. The Subcontractor shall not deal directly with or work directly for Owner. This instrument is the entire Agreement between the parties. If any provision herein is held to be invalid by any competent court, the remaining Agreement shall survive. This Agreement shall control any inconsistency in any documents referred to or incorporated by reference. It is further agreed that no action or failure to act by the Contractor shall constitute a waiver of any breach of any term or condition in the Agreement or any subsequent breach thereof, not shall such action or failure to act constitute a waiver of any right offered Contractor under this Agreement.

### OSHA

32. Subcontractor shall comply with OSHA and any other relevant and applicable federal, state and local safety regulations, standards and requirements. Subcontractor shall indemnify Contractor from any failure to comply with these requirements including fines and abatement costs and delays to project. Failure to comply shall be a breach of contract, subject to provisions of Paragraph 13.

### Liquidated Damages

33. In the event that liquidated damages are assessed against the Contractor and it is determined that Subcontractor is responsible to the Contractor for said liquidated damages, then Subcontractor shall pay to the Contractor liquidated damages in addition to any damages incurred by the Contractor as the result of Subcontractor's failure of performance.

### Mechanic's Liens

34. Subcontractor hereby waives it right to any mechanic's liens on the property of the Owner to the extent allowed by law.

### Execution

35. This subcontract must be executed by the Subcontractor and returned to the Contractor within fifteen (15) days of its receipt by the Subcontractor. Until the subcontract is executed and returned to the Contractor, along with any required bonds and certificates of insurance, the Contractor has the right to withhold any payment due the Subcontractor.

### Governing Law

36. This subcontract shall be governed by the laws of the State where Contractor has its principal office and any actions or lawsuits arising hereunder to the extent permitted by law shall be brought in the District where Contractor's principal office is located without regard to principles of conflict of laws or forum non-convenience.

6

Subcontract #03096CHER001

**CHERRY HILL CONSTRUCTION**
Subcontractor

Signature

James A. Openshaw, Jr., President
Name & Title

Date:  2/23/04

**GRUNLEY-WALSH JOINT VENTURE**
Contractor

Signature

Loren D. Raap, General Manager
Name & Title

Date:  3-4-04

*Subcontractor to sign and initial each sheet and return both copies of the Subcontract Agreement to the Contractor within fifteen days.  The Contractor will then sign and return one copy for the Subcontractor's files.*

7
*Date 2/2/04*

| PAYMENT BOND (See Instructions on reverse) | DATE BOND EXECUTED (Must be same or later than date of contract) December 5, 2003 | FORM APPROVED OMB NO 9000-0045 BOND NO. 400SU1001 / 823110922 |
|---|---|---|

Public reporting burden for this collection of information is estimated to average 25 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (VRS), Office of Federal Acquisition Policy, GSA, Washington, D.C. 20405; and to the Office of Management and Budget, Paperwork Reduction Project (9000-0045), Washington, D.C. 20503.

**PRINCIPAL (Legal name and business address)**

Grunley-Walsh Joint Venture, LLC
11910 Parklawn Drive, Suite U
Rockville, MD  20852

**SURETY(IES) (Name(s) and business address(es))**

St. Paul Fire and Marine Insurance Company, 14120
Newbrook Drive, Suite 160, Chantilly, VA
20151-2223 and The Continental Insurance Company, 6021
University Boulevard, Suite 500, Ellicott City, MD  21043

**TYPE OF ORGANIZATION ("X" one)**

☐ INDIVIDUAL   ☐ PARTNERSHIP
☐ JOINT VENTURE   ☒ CORPORATION

**STATE OF INCORPORATION**
MD

**PENAL SUM OF BOND**

| MILLION(S) | THOUSAND(S) | HUNDRED(S) | CENTS |
|---|---|---|---|
| 13 | 993 | 216 | 00 |

**CONTRACT DATE**
12/05/03

**CONTRACT NO.**
1445CX305098901,
Task Order No. 35

**OBLIGATION:**

We, the Principal and Surety (ies), are firmly bound to the United States of America (hereinafter called the Government) in the above penal sum. For payment of the penal sum, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally. However, where the Sureties are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only for the purpose of allowing a joint action or actions against any or all of us. For all other purposes, each Surety binds itself, jointly and severally with the Principal, for the payment of the sum shown opposite the name of the Surety. If no limit of liability is indicated, the limit of liability is the full amount of the penal sum.

**CONDITIONS:**

The Above obligation is void if the Principal promptly makes payment to all persons having a direct relationship with the Principal or a subcontractor of the Principal for furnishing labor, material or both in the prosecution of the work provided for in the contract identified above, and any authorized modifications of the contract that subsequently are made. Notice of those modifications to the Surety(ies) are waived.

**WITNESS:**

The Principal and Surety(ies) executed this payment bond and affixed their seals on the above date.

| Grunley-Walsh Joint Venture, LLC | PRINCIPAL | | | |
|---|---|---|---|---|
| SIGNATURE(S) | 1. (Seal) | 2. (Seal) | 3. (Seal) | Corporate Seal |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | 3. | |

| | INDIVIDUAL SURETY(IES) | | |
|---|---|---|---|
| SIGNATURE(S) | 1. (Seal) | 2. | (Seal) |
| NAME(S) (Typed) | 1. | 2. | |

**CORPORATE SURETY(IES)**

| SURETY A | St. Paul Fire and Marine Insurance Company 14120 Newbrook Drive, Suite 160 Chantilly, Virginia  20151-2223 | STATE OF INC. | LIABILITY LIMIT | |
|---|---|---|---|---|
| NAME & ADDRESS | | MN | $ 284,816,000 | Corporate Seal |
| SIGNATURES | 1. | 2. | | |
| NAME(S) & TITLE(S) (Typed) | 1. Stephen A. Spencer  Attorney-In-Fact | 2. | | |

NSN 7540-01-152-8041.
Previous edition not usable

STANDARD FORM 25-A     (REV 1-90)
Prescribed by GSA - FAR (48 CFR) 53.228 (c)



EXHIBIT
2

CORPORATE SURETY(IES) (Continued)

| SURETY B | | | STATE OF INC. | LIABILITY LIMIT | |
|---|---|---|---|---|---|
| NAME & ADDRESS | The Continental Insurance Company 6021 University Boulevard, Suite 500 Ellicott City, Maryland  21043 | | NH | 473,109,000 | Corporate Seal |
| SIGNATURES | 1. | 2. | | | |
| NAME(S) & TITLE(S) (Typed) | Stephen A. Spencer Attorney-in-Fact | | | | |
| SURETY C | | | STATE OF INC. | LIABILITY LIMIT | |
| NAME & ADDRESS | | | | | Corporate Seal |
| SIGNATURES | 1. | 2. | | | |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | | |
| SURETY D | | | STATE OF INC. | LIABILITY LIMIT | |
| NAME & ADDRESS | | | | | Corporate Seal |
| SIGNATURES | 1. | 2. | | | |
| NAME(S) & TITLE(S) (Typed) | 1. | | | | |
| SURETY E | | | STATE OF INC. | LIABILITY LIMIT | |
| NAME & ADDRESS | | | | | Corporate Seal |
| SIGNATURES | 1. | 2. | | | |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | | |
| SURETY F | | | STATE OF INC. | LIABILITY LIMIT | |
| NAME & ADDRESS | | | | | Corporate Seal |
| SIGNATURES | 1. | 2. | | | |
| NAME(S) & TITLE(S) (Typed) | 1. | | | | |
| SURETY G | | | STATE OF INC. | LIABILITY LIMIT | |
| NAME & ADDRESS | | | | | Corporate Seal |
| SIGNATURES | 1. | 2. | | | |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | | |

INSTRUCTIONS

6. This form, for the protection of persons supplying labor and material, is used when a payment bond is required under the Act of August 24, 1935, 49 Stat. 793 (40 U.S.C. 270a-270e). Any deviation from this form will require the written approval of the Administrator of General Services.

7. Insert the full legal name and business address of the Principal in the space designated "Principal" on the face of the form. An authorized person shall sign the bond. Any person signing in a representative capacity (e.g., an attorney-in-fact) must furnish evidence of authority if that representative is not a member of the firm, partnership, or joint venture, or an officer of the corporation involved.

8. (a) Corporations executing the bond as a surety must appear on the Department of the Treasury's list of approved sureties and must act within the limitation listed therein. Where more than one corporate surety is involved, their names and addresses shall appear in the spaces (Surety A, Surety B, etc.) headed "CORPORATE SURETY(IES)." In the space designated "SURETY(IES)" on the face of the form, insert only the letter identification of the sureties. (b) Where individual sureties are involved, a completed Affidavit of Individual Surety (Standard Form 28), for each individual surety shall accompany the bond. The Government may require the surety to furnish additional substantiating information concerning its financial capability.

9. Corporations executing the bond shall affix their corporate seals. Individuals shall execute the bond opposite the word "Corporate Seal", and shall affix an adhesive seal if executed in Maine, New Hampshire, or any other jurisdiction requiring adhesive seals.

10. Type the name and title of each person signing this bond in the space provided.

STANDARD FORM 25-A (REV. 1-90) BACK

**StPaul Surety**

St. Paul Fire und Marine Insurance Company      United States Fidelity and Guaranty Company
Paul Guardian Insurance Company                 Fidelity a       aarranty Insurance Company
Paul Mercury Insurance Company                  Fidelity &   .uaranty Insurance Underwriters, Inc.
Seaboard Surety Company                         St. Paul Medical Liability Insurance Company

Bond No. 400501001

### RIDER CONTAINING
### DISCLOSURE NOTICE OF TERRORISM COVERAGE

This disclosure notice is required by the Terrorism Risk Insurance Act of 2002 (the "Act"). No action is required on your part. This Disclosure Notice is incorporated in and a part of the attached bond, and is effective the date of the bond.

You should know that, effective November 28, 2002, any losses covered by the attached bond that are caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by the Act. Under this formula, the United States reimburses 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

Under the Act, there is a cap on our liability to pay for covered terrorism losses if the aggregate amount of insured losses under the Act exceeds $100,000,000,000 during the applicable period for all insureds and all insurers combined. In that case, we will not be liable for the payment of any amount which exceeds that aggregate amount of $100,000,000,000.

The portion of your premium that is attributable to coverage for acts of terrorism is **$0.00.**

IMPORTANT NOTE: THE COST OF TERRORISM COVERAGE IS SUBJECT TO CHANGE ON ANY BONDS THAT PREMIUM IS CHARGED ANNUALLY.

# NOTICE

In accordance with the Terrorism Risk Insurance Act of 2002, we are providing this disclosure notice for bonds and certain insurance policies on which one or more of the Writing Companies identified below is the surety or insurer.

To principals on bonds and insureds on certain insurance policies written by any one or more of the following companies (collectively the "Writing Companies") as surety or insurer: Western Surety Company, Universal Surety of America, Surety Bonding Company of America, Continental Casualty Company, National Fire Insurance Company of Hartford, American Casualty Company of Reading, PA, The Fireman's Insurance Company of Newark, NJ, and The Continental Insurance Company.

## DISCLOSURE OF PREMIUM

The premium attributable to coverage for terrorist acts certified under the Act was Zero Dollars ($0.00).

## DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES

The United States will pay ninety percent (90%) of covered terrorism losses exceeding the applicable surety/insurer deductible.

Form F7313

| | | |
|---|---|---|
| CHERRY HILL CONSTRUCTION, INC. | * | IN THE |
| 8211 Washington Boulevard | | |
| Jessup, Maryland, 20794-0356, | * | CIRCUIT COURT |
| | | |
| Plaintiff, | * | FOR |
| | | |
| v. | * | MONTGOMERY COUNTY |
| | | |
| GRUNLEY-WALSH JOINT VENTURE, LLC | * | Civil Case No. _____ |
| 5010 Nicholson Lane, Suite 200 | | |
| Rockville, MD 20852 | * | |
| | | |
| Defendant | * | |
| | | |
| Serve on Resident Agent: | * | |
| | | |
| Herman M. Braude | * | |
| 6006 Neilwood Drive | | |
| Rockville, Maryland 20850 | * | |
| | | |
| And | * | |
| | | |
| ST. PAUL FIRE AND MARINE INSURANCE | * | |
| COMPANY | | |
| 380 Jackson Street, No. 700 | * | |
| St. Paul, Minnesota 55101 | | |
| | * | |
| Defendant | | |
| | * | |
| Serve on: | | |
| | * | |
| Ralph S. Tyler, Esq., | | |
| Maryland Insurance Administration | * | |
| 525 St. Paul Place | | |
| Baltimore, MD 21202 – 2272 | * | |
| | | |
| And | * | |
| | | |
| THE CONTINENTAL INSURANCE COMPANY | * | |
| CNA Plaza | | |
| 333 S. Wabash | * | |
| Chicago, Illinois 60685 | | |
| | | |
| Defendant | * | |

**EXHIBIT**

**3**

Serve On:                                    *

Ralph S. Tyler, Esq.,                        *
Maryland Insurance Administration
525 St. Paul Place                           *
Baltimore, MD 21202 - 2272
                                             *

*      *      *      *      *      *      *      *      *      *      *      *      *

## COMPLAINT

Cherry Hill Construction, Inc. ("Cherry Hill"), by and through its undersigned counsel,

hereby files this Complaint against Grunley-Walsh Joint Venture LLC ("Grunley"), St. Paul Fire

and Marine Insurance Company ("St. Paul"), and The Continental Insurance Company ("CNA"),

and as grounds therefore states as follows:

### I.    The Parties

1.     Plaintiff Cherry Hill is a construction company organized and existing under the

laws of the State of Maryland, with its principal place of business at 8211 Washington

Boulevard, Jessup, Maryland, 20794-0356.

2.     Defendant Grunley is a limited liability company organized and existing under the

laws of the State of New York, with its principal place of business at 5010 Nicholson Lane, Suite

200, Rockville, Maryland, 20852.

3.     Defendant St. Paul is a surety company organized and existing under the laws of

the State of Minnesota, with its principal place of business at 380 Jackson Street, No. 700, St.

Paul, Minnesota, 55101.

4.    . Defendant CNA is a surety company organized and existing under the laws of the

State of Illinois, with its principal place of business at 333 S. Wabash, Chicago, Illinois, 60685.

### III.    Facts

   5.    On or about December 5, 2003, Grunley entered into a Contract with the National Capitol Parks – Central, Contract No. 1443C3059980901 –Task Order No. 35 – Mobilization Phase. The name of the project was Washington Monument Design and Construction (the "Project"), and the location of the project was Washington Monument, Washington, DC (the "Contract").

   6.    The obligation of Grunley to pay for labor, material or both furnished for use in the performance of the Contract was covered by Payment Bond No. No. 400SU1001/929310622, issued by St. Paul and CNA, in the penal sum of $13,993,216.00 (the "Bond"). A copy of the Bond is attached hereto as Exhibit A.

   7.    On or about March 4, 20054, Cherry Hill entered into a Subcontract Agreement with Grunley to perform "site work/site survey/concrete/Bollards/Add Alternate List" for a subcontract sum of $6,054,859.00 (the "Subcontract"). A copy of the Subcontract is attached hereto as Exhibit B.

   8.    During the course of the project, Grunley issued the following six change orders to Cherry Hill:

| | |
|---|---|
| Change Order 001 | Administrative error; zero value |
| Change Order 002 | Various construction items: ($193,532.00) |
| Change Order 003 | Various modifications: $185,041.00 |
| Change Order 004 | Administrative error; zero value |
| Change Order 005 | Various site conditions: $139,860.00 |
| Change Order 006 | Various site conditions: $249,616.00 |

The sum total of the change orders issued to Cherry Hill is $380,985.00. A copy of change order numbers 2, 3, 5 and 6 is attached hereto as Exhibit C.

9.     Also during the course of the project Cherry Hill performed numerous items of changed work as directed by Grunley. The value of the directed change orders is $1,219,257. A spreadsheet listing the directed changes is attached hereto as Exhibit D.

10.    In the aggregate, the six change orders issued by Grunley, and the directed change orders performed by Cherry Hill, increased the contract value by $1,600,242, to a sum total of $7,655,101.

11.    Cherry Hill completed Contract work at the Project in December 2006. All of the work performed by Cherry Hill has been accepted and approved by Grunley.

12.    To date, Grunley has remitted payments to Cherry Hill in the total. amount of $6,304,003. Deducting that amount from the contract value of $7,655,101 results in an outstanding balance due and owing to Cherry Hill of $1,351,098.

13.    Cherry Hill has made repeated requests to Grunley for payment of its remaining Contract amount. Despite these requests, and in breach of its obligations under the Subcontract, Grunley has to date failed and refused to remit the outstanding balance to Cherry Hill.

14.    By letter to St. Paul, CNA and Grunley dated September 21, 2007, Cherry Hill demanded that the sureties and the contractor remit payment of the amount due and owing from Grunley of $1,351,098.    A copy of the letter is attached hereto as Exhibit E.  Despite this request, and in breach of the obligations of St. Paul and CNA under the Bond, and in breach of the obligations of Grunley under the Subcontract, the outstanding balance has not been remitted to Cherry Hill.

**Count I**
**(Breach of Express Contract)**

15.    Cherry Hill incorporates by reference, and realleges, paragraphs 1 through 15 above.

16.    The Subcontract between Cherry Hill and Grunley obligated Grunley to pay Cherry Hill in a timely manner for work performed by Cherry Hill under the Subcontract and/or at the direction of Grunley.

17.    Grunley materially breached the Subcontract by failing to timely and fully pay Cherry Hill for changed work faithfully performed by Cherry Hill pursuant to the Subcontract and/or at the direction of Grunley.

18.    As a direct and proximate result of Grunley's breach, Cherry Hill has been damaged in the amount of $1,351,098, plus interest.

WHEREFORE, Cherry Hill respectfully requests judgment against Grunley in the amount of $1,351,098, plus interest.

**Count II**
**(Breach of Implied in Fact Contract – Quantum Meruit)**

19.    Cherry Hill incorporates by reference, and realleges, paragraphs 1 through 18 above.

20.    At the request and direction of Grunley, Cherry Hill rendered and provided valuable labor, material and related construction services to Grunley on the Project, with the intention of payment from Grunley for such labor, materials and services.

21.    Grunley accepted the labor, material and services that Cherry Hill provided to Grunley on the Project, and received the benefit of such labor, material and services.

22.     All labor, material and services rendered and provided by Cherry Hill to Grunley were rendered and provided under such circumstances that Grunley knew or should have known that Cherry Hill expected to be paid for such labor, material and services.

23.     Cherry Hill is entitled to recover the value, quantum meruit, of the labor, material and services it rendered and provided to Grunley for which it has not been paid, in the amount of $1,351,098, plus interest.

WHEREFORE, Cherry Hill respectfully requests judgment against Grunley in the amount of $1,351,098, plus interest.

## Count III
### (Breach of Quasi-Contract – Unjust Enrichment)

24.     Cherry Hill incorporates by reference, and realleges, paragraphs 1 through 23 above.

25.     At the request and direction of Grunley, Cherry Hill rendered and provided valuable labor, material and related construction services to Grunley on the Project, with the intention of payment from Grunley for such labor, materials and services.

26.     Grunley accepted the labor, material and services that Cherry Hill provided to Grunley on the Project, and received the benefit of such labor, material and services.

27.     All labor, material and services rendered and provided by Cherry Hill to Grunley were rendered and provided under such circumstances that Grunley knew or should have known that Cherry Hill expected to be paid for such labor, material and services.

28.     Under the circumstances, it is inequitable for Grunley to retain the benefit of the labor, material and services provided by Cherry Hill without the payment of the value of said labor, material and services to Cherry Hill.

29.    The value of the labor, material and services furnished by Cherry Hill to Grunley,
and for which Cherry Hill has to date not been paid, is $1,351,098, plus interest.

WHEREFORE, Cherry Hill respectfully requests judgment against Grunley in the
amount of $1,351,098, plus interest.

### Count IV
### (Breach of Payment Bond)

30.    Cherry Hill incorporates by reference, and realleges, paragraphs 1 through 29
above.

31.    Cherry Hill had a direct contract with Grunley to furnish labor, materials or both
for use in Grunley's performance of the Contract, and as such, is a beneficiary under the Bond
issued by St. Paul and CNA.

32.    Grunley breached the Subcontract by not remitted payment to Cherry Hill of the
outstanding balance of $1,351,098, plus interest.

33.    St. Paul and CNA have not remitted payment to Cherry Hill per the Bond of the
outstanding balance owed by Grunley to Cherry Hill of $1,351,098, plus interest.

34.    Under the terms and provisions of the Bond, St. Paul and CNA are obligated to
remit payment to Cherry Hill in the amount of $1,351,098, representing the amount due and
owing to Cherry Hill for labor, materials and equipment furnished to Grunley for use in
performing the Contract, plus interest.

WHEREFORE, Cherry Hill respectfully requests judgment against St. Paul and CNA in
the amount of $1,351,098, plus interest.

CHERRY HILL CONSTRUCTION, INC.

By: _____
Counsel

Joseph C. Kovars
Jay Bernstein
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 E. Baltimore Street
Baltimore, MD 21202-1643
(410) 685-1120 (telephone)
(410) 547-0699 (facsimile)

1955437.v1