IN THE UNITED STATES DISRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

CHERRY HILL CONSTRUCTION, INC.     *

       Plaintiff,     *

v.     *

GRUNLEY-WALSH JOINT VENTURE, LLC,  *  Case No. 8:07-cv-3476-AW
ST. PAUL FIRE AND MARINE INSURANCE
COMPANY, THE CONTINENTAL INSURANCE  *  Judge Alexander Williams, Jr.
COMPANY

       *

       Defendants     *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO STAY
PENDING EXHAUSTION OF MANDATORY DISPUTES PROCEDURES**

Cherry Hill Construction, Inc. ("Cherry Hill"), by and through its undersigned counsel, hereby files this memorandum in opposition to the motion filed herein by Grunley-Walsh Joint Venture LLC ("Grunley"), St. Paul Fire and Marine Insurance Company and The Continental Insurance Company (collectively, the "Sureties"), moving the Court to stay this litigation.

Neither of the two reasons given by Grunley in support of a stay are valid. First, Grunley's argument that Cherry Hill's claims should be stayed because Grunley has not been paid by the Owner is, as a matter of law, not a valid defense under the law to a payment bond claim. Second, Grunley's argument that Cherry Hill's claims must be stayed because under the Subcontract, Cherry Hill is obligated to await the resolution of the disputes process pending between Grunley and NPS in the United Stated Federal

Court of Claims, is invalid because the disputes process of the prime contract does not apply to Cherry Hill's claims, most of which are not part of the Court of Claims litigation, and virtually all of which are unrelated to the Owner. Accordingly, the Court should deny Grunley's motion to stay this proceeding.

## STATEMENT OF FACTS

1.      Grunley entered into a Contract with the National Park Service ("NPS") for the "Washington Monument Design and Construction" (the "Project"). As required by the Miller Act, 40 U.S.C. §3131, et seq., the obligation of Grunley to pay for labor or materials furnished for use in the performance of the Contract was covered by a payment bond  issued by St. Paul and CNA, in the penal sum of $13,993,216 (the "Bond") (Exhibit 1).

2.      Cherry Hill, a Maryland corporation, entered into a Subcontract Agreement with Grunley, a Maryland limited liability company, to perform "site work/site survey/concrete/Bollards/Add Alternate List" at the Project. (Exhibit 2)  The Subcontract Agreement provides, in Section 36, that Maryland law was to apply to the Subcontract. Cherry Hill completed its work at the Project in December 2006. (Exhibit 3, Myckow Affidavit, Parag. 3).

3.      During the course of the contract, Cherry Hill incurred significant costs to perform extra work items which were the subject of numerous requests for change orders ("RCO's"), at a total cost to Cherry Hill of $1,240,300.   To date, these RCOs remain unpaid by Grunley and the Sureties.  (Myckow Affidavit, Parag. 4).

4.      Thirty-four RCO's were the subject of Change Order No. 7, which Grunley issued to Cherry Hill on March 28, 2006. (Exhibit 4).  The net amount of these

RCO's as priced in Change Order No. 7 resulted in a deduction to the contract price of $36,248. (Myckow Affidavit, Parag. 5).[1]

5.     Forty-six RCO's were agreed to by Cherry Hill and Grunley at a meeting on April 21, 2006, and memorialized in a letter from Cherry Hill to Grunley dated April 24, 2006.  (Exhibit 5).   The letter confirmed that Cherry Hill would be paid the cumulative sum of $558,291 for the 46 RCO's.  In response to the letter, Grunley informed Cherry Hill that it would issue a Change Order for the RCO's listed in the letter, as well as several other RCO's valued at $39,912. (Myckow Affidavit, Parag. 6).

6.     During the Project, Grunley and NPS negotiated contract modification numbers 6, 7 and 8, which increased the contract by $1,461,350. (Exhibit 6). [2]  These modifications included payment for many of the RCO's which were agreed to by Cherry Hill and Grunley as per the letter of April 24, 2006. To date, Grunley has not paid Cherry Hill for any of the RCO's addressed in Modification Nos. 6, 7 and 8.   (Myckow Affidavit, Parag. 8).

7.     In addition to the RCO's agreed to in Change Order No. 7 and at the April 21, 2006 meeting, 19 other RCO's, in the total amount of $678,345, remain pending for payment by Grunley to Cherry Hill.  (Myckow Affidavit, Parag. 7).

8.     Grunley has submitted various claims for payment of extras by NPS, which are now pending for disposition before the United States Court of Federal Claims.

---

[1]     Cherry Hill disputes 7 of the Grunley credit or backcharge items in Change Order No. 7.  The dispute is over approximately $10,000.  (Myckow Affidavit, Parag. 5).

[2]     Modification No. 6, dated September 22, 2005, increased the contract by $467,423; Modification No. 7, dated October 13, 2005, increased the contract by $681,142; and Modification No. 8, dated May 1, 2005, increased the contract by $312,785.

Most of the RCO's for which Cherry Hill now seeks payment from Grunley are not part of the Court of Federal Claims action, and of the few that are included, almost all of them were agreed by Grunley to be paid to Cherry Hill, either in Change Order No. 7 or at the April 21, 2006 meeting. (Myckow Affidavit, Parag. 9). [3]

9.    The amount due and owing from Grunley and the Sureties to Cherry Hill is $1,372,141. This represents the contract amount (as adjusted by change orders 1 through 6) of $6,435,844, [4] plus the outstanding RCO's valued at $1,240,300, less the payments remitted to Cherry Hill by Grunley of $6,304,003. (Myckow Affidavit, Parag. 10).

## ARGUMENT

1.    The failure of the owner to pay Grunley does not preclude Cherry Hill from pursuing its claims against Grunley and the Sureties.

In its motion, Grunley relies on the decision of the Maryland Court of Special Appeals in *Gilbane Building, Co. v. Brisk Waterproofing Co., Inc*., 86 Md. App. 21, 585 A.2d 248 (1991). In *Gilbane*, the Court upheld a contract clause which makes the receipt of payment from the owner a condition precedent to the obligation of the general contractor to pay the subcontractor. Claiming that a similar clause is contained in the subcontract between Grunley and Cherry Hill, Grunley argues that the *Gilbane* case

---

[3] Only 25 of the RCO's at issue in this case are pending as part of the Court of Federal Claims litigation, and Grunley agreed to pay Cherry Hill for all but two of these RCO's, either in Change Order No. 7 or in the April, 2006 meeting. (Myckow Affidavit, Parag. 9).

[4] Grunley issued six change orders to Cherry Hill, in the sum total of $380,985: Change Order 001(zero value); Change Order 002 ($193,532); Change Order 003 ($185,041); Change Order 004 (zero value); Change Order 005 ($139,860); and Change Order 006 ($249,616). These change orders, which are not in dispute, did not address the RCO's that are at issue in this case.

requires the Court to stay Cherry Hill's lawsuit until the condition precedent (namely, the receipt by Grunley of payment from NPS) occurs. [5]

For several reasons, the reasoning of the *Gilbane* case has no bearing upon Cherry Hill's claims in this case. First and foremost, the holding in *Gilbane* applies only to contract claims on a construction contract. As regards to claims under a Miller Act payment bond, such as the claims asserted here by Cherry Hill, the law is clear that contract clauses conditioning payment to the subcontractor upon the receipt by the general contractor of payment from the owner are of no effect. The purpose of the Miller Act is to protect persons supplying labor or materials to federal projects, where a mechanic's lien cannot attach to government projects. *U.S. ex rel. Acme Furnace Fitting Co. v. Fort George Meade Defense Housing Corp.*, 186 F.Supp. 639, 645 (D.Md. 1960). The Miller Act is "highly remedial (and) entitled to a liberal construction and application in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public property." *F.D. Rich Co., Inc. v. United States*, 417 U.S. 116, 124 (1974). Courts have held that a "pay-if-paid" clause is no defense to a claim under a Miller Act payment bond. *United States ex rel. DDC Interiors v. Dansonn Construction Co.,* 895 F.Supp. 270 (D. Colo. 1995) *affd.*, 82 F.3d 427 (10th Cir. 1996); *United States ex*

---

[5]    In *Gilbane,* the Court held that an unpaid subcontractor was not entitled to summary judgment in its favor because under the subcontract, payment by the owner to the general contractor was a condition precedent to the obligation of the general contractor to pay the subcontractor. The case does not address the issue raised by Grunley's motion of whether the payment by the owner to the general contractor is a condition precedent to the right of the subcontractor to proceed with its cause of action. In fact, nothing in the *Gilbane* decision requires subcontractor claims to be stayed pending owner payments to the general contractor, nor does any provision in the subcontract between Grunley and Cherry Hill establish such a requirement.

*rel.* and *MS Mechanical Contractors v. Millers Mut. Fire Ins. Co.,* 942 F.2d 946 (5th Cir. 1991).

In addition, it is the public policy in Maryland not to enforce such "pay-if-paid" clauses."  Maryland law, which the parties agreed to govern the Subcontract, provides as follows:

> A provision in an executory contract between a supplier and a contractor or subcontractor that is related to a construction contract and that conditions payment to the supplier on receipt of payment by the person from a public body or other third party, may not abrogate or waive the right of the supplier to sue on payment security under this subtitle.

Maryland Code Annotated, *State Finance and Procurement Article*, Section 17-108(d)(2).  Likewise, Maryland Code Annotated, *Real Property Article*, Section 9-113(b) & (c) which provides that a contract provision that conditions payment to the subcontractor or the contractor's receipt of payment from the owner may not abrogate or waive the subcontractor's right to sue on a bond, and that a contract provision which does so is "void as against the public policy of the State."  Pursuant to these statutes, the condition precedent language in the Grunley-Cherry Hill subcontract does not affect the right of Cherry Hill to seek recovery of outstanding contract funds from Grunley and the Sureties.   Accordingly, the fact that Grunley has not received payment from the Owner does not justify staying Cherry Hill's litigation against Grunley and the Sureties.

Maryland's policy as reflected in the statutes referenced above is consistent with the approach taken by the Fourth Circuit in *Moore Bros. Co. v. Brown & Root, Inc.,* 207 F.3d 717 (4th Cir. 2000).  In that case, the Court ruled that a surety cannot assert the principal's defense based on "pay when paid" language in the subcontract, when the

surety did not expressly incorporate the "pay when paid" language into the contract payment bond.  The Court noted:

> … the very purpose of securing a surety bond contract is to insure that claimants who perform work are paid for their work *in the event that the principal does not pay*.  To suggest that non-payment by the Owner absolves the surety of its obligation is nonsensical, for it defeats the very purpose of a payment bond.

*Id.* at 723.  Inasmuch as the condition precedent language of the Cherry Hill-Grunley Subcontract relied upon by Grunley is not expressly incorporated into the payment bond, the rationale of *Moore* provides an additional basis for the Court rejecting Grunley's motion to stay.

Grunley's reliance on *Gilbane* is also inapt because in *Gilbane*, there was no dispute that the amounts claimed due by the subcontractor were subject to the contract clause which made payment to the general contractor a condition precedent to payment to the subcontractor (the issue in *Gilbane* was whether the clause should be interpreted to postpone payment for a reasonable time, or as a condition precedent upon the obligation to pay).  In contrast, the amounts claimed due by Cherry Hill relate to extra work which is <u>not</u> subject to the condition precedent language of the Subcontract between Grunley and Cherry Hill. The Subcontract distinguishes between extra work directed by Grunley, and extra work ordered by the Owner; Section 15 of the Subcontract clearly states that <u>only changes ordered by the Owner</u> are subject to the condition precedent that payment must be received by Grunley from the owner before payment is due to Cherry Hill. [6]

---

[6] Section 15 of the Subcontract, "Owner Changes," states, "Changes ordered by Owner shall be performed and paid for in accordance with the terms of the Prime Contract, including all rights of dispute and appeal, provided reservation and exercise of said rights to not interfere with the progress of the work.  Payment for Owner changes

This condition precedent has no application to the RCO's at issue in this case, which Cherry Hill performed at the direction of Grunley, and for which Grunley agreed to pay Cherry Hill. [7]

2.    Cherry Hill is not bound by, nor required to await exhaustion of, the disputes process pending between Grunley and NPS.

The subcontract between Cherry Hill and Grunley establishes a two-track system for resolving contract disputes:

If a dispute between Cherry Hill and Grunley arises out of Owner acts, omissions or responsibilities, Section 17 of the Subcontract requires that it be resolved in accordance with the disputes procedure in the Prime Contract. In this case, the Prime Contract between Grunley and the Owner incorporated the disputes clause of the Federal Acquisition Regulations, which requires claims to be submitted to the Contracting Officer for final decision, and for those final decisions to be appealed to the United States Federal Court of Claims.

On the other hand, if a dispute between Cherry Hill and Grunley does not involve the Owner's acts, omissions or responsibilities, then the Contractor has the option to have the dispute resolved by arbitration in accordance with the rules of the American Arbitration Association.    The option of the Contractor to request arbitration is the only limitation imposed by the Subcontract on the right of Cherry Hill to seek legal recourse

---

shall be made in accordance with Paragraph 5, Price and Payment, and payment for Owner changes shall not be due the Subcontractor as a specific condition precedent until the Contractor from the Owner receives said payment." (Emphasis added).

[7]    Even under the rationale of *Gilbane,* Cherry Hill's claims should not be stayed because Grunley – as part of NPS's issuance of Modifications 6, 7 and 8 -- was in fact paid for many of the RCO's claimed by Cherry Hill. Thus, to the extent the receipt of payment from NPS was a condition precedent to the obligation of Grunley to pay Cherry Hill, the condition was satisfied.

for a dispute with Grunley that does not involve the Owner.[8]  In such a situation, the procedures set forth in the disputes clause of the Federal Acquisition Regulations, which bind Grunley relative to claims against the Owner, are inapplicable to Cherry Hill's efforts to seek recourse from Grunley.

The claims for which Cherry Hill seeks compensation in this litigation do not involve the Owner's acts, omissions or responsibilities.  Rather, the disputed RCO's were performed at the direction of Grunley, and Cherry Hill's entitlement to payment for these RCO's does not implicate NPS.  This is reflected in Grunley's issuance of Change Order No. 7, and in the letter of April 24, 2006 from listing Cherry Hill to Grunley, both of which list the RCO's agreed to between the parties, as well as the agreed upon values of each RCO listed.  It is also reflected by the fact that the NPS addressed and satisfied its responsibility for the RCO's when it issued to Grunley Modification Nos. 6, 7 and 8. These modifications compensated Grunley for many of the RCO's for which Cherry Hill is still seeking payment from Grunley.

Most significantly, the overwhelming bulk of the RCO's for which Cherry Hill is seeking compensation in its cause of action against Grunley are not part of the claims which are being litigated by Grunley with NPS.  Grunley's statement in its motion that Cherry Hill's claims in this litigation "are part of the appeal Complaint and are specifically included in the consolidated action" pending before the United States Court of Federal Claims (Grunley Memorandum, p. 4) is false.  In reality, just 25 of the disputed RCO's (representing a small portion of the $1,240,300 claimed by Cherry Hill

---

[8] The enforceability of a one-sided arbitration clause like the one in the Cherry Hill-Grunley Subcontract is doubtful under Maryland law, due to a lack of consideration. See, *Cheek v. United Healthcare of the Mid Atlantic*, 378 Md. 139, 835 A.2d 656 (2003).

for all of the outstanding RCO's) are included in the claims that Grunley is prosecuting against NPS before the Court of Federal Claims, and 23 of those 25 RCO's have already been settled as between Cherry Hill and Grunley, either in Change Order No. 7 or in the letter of April 24, 2006.

This is fatal to Grunley's motion for a stay for two reasons. First, it confirms Cherry Hill's position that most of its claims <u>do not</u> involve the Owner's acts, omissions or responsibilities (and therefore are not bound by the disputes procedure in the prime contract), since if they <u>did</u> involve the Owner's acts, omissions or responsibilities, Grunley would have (and should have) included them in the Court of Federal Claims case. Second, regardless of how Cherry Hill's claims are categorized, the fact that Grunley has not passed the claims on to the Owner, and has excluded them from the Court of Federal Claims litigation, relieves Cherry Hill of any obligation to have its claims resolved in accordance with the disputes procedure in the Prime Contract, and frees Cherry Hill to independently prosecute its claims against Grunley in this forum.

In support of its motion, Grunley cites *Seal & Co. Inc. v A.S. McGaughan Co., Inc.*, 907 F.2d 450 (4th Cir. 1990) and *Norment Security Group Inc. v. Travelers Casualty and Insurance Company*, 505 F.Supp. 2d 97 (D.D.C. 2007). In both cases, a subcontractor claim was stayed pending the exhaustion of administrative procedures being pursued by the prime contractor against the owner, because in both cases, the subcontractor claim fell within the category of claims to be adjudicated between the prime contractor and the owner. In *Seal*, the subcontractor claim turned on the interpretation of a provision of the general provisions of the prime contract, and therefore was governed by the subcontract clause that subjected disputes between the contractor

and subcontractor due to actions of the owner <u>or involving the contract documents</u> to the disputes provision of the prime contract. *Id.* at 454. In *Norment*, the subcontractor's claim for delay costs was stayed because the prime contractor had submitted the claims to the government for payment, and the subcontract stated that the subcontractor was entitled to payment for delay only if the government is liable for, and pays for, such delays. *Id.* at 104, 105. Here, the Subcontract between Grunley and Cherry Hill requires Cherry Hill to follow the administrative procedures of the prime contract only as to claims which not involve the Owner's acts, omissions or responsibilities, which Cherry Hill's claims do not involve; consequently, and unlike the subcontractors in *Seal* and in *Norment,* Cherry Hill is free to seek relief from the courts in this action.

More relevant to the issue at hand than the cases cited by Grunley is *United States v. William Claremont, Inc.,* 341 F.Supp. 940 (D.Neb. 1970). In *Claremont*, the prime contractor and the surety moved for an order staying the subcontractor's action pending the outcome of the prime contractor's claim against the government for additional compensation. The Court denied the motion because the subcontractor's claims were based upon "delay and malfeasance by the prime contractor," and not upon the action or inaction of the government. *Id.* at 943. In such a situation, noted the Court, the disputes clause of the government contract affords the subcontractor no mechanism for relief; "(o)nly through the Miller Act lies redress for the subcontractor, if his claims are valid." *Id.* at 944. Likewise, the disputes provision of the prime contract between Grunley and NPS does not provide any relief to Cherry Hill for its outstanding RCO's, which are unrelated to the acts or omissions of NPS. For such claims, both the Subcontract and

basic principles of equity permit Cherry Hill to proceed directly against Grunley, without waiting for adjudication of Grunley's unrelated claims by the Court of Federal Claims.

3.    <u>The disputes process of the Subcontract is inapplicable to Cherry Hill's claim against the payment bond Sureties.</u>

Relative to the claims asserted by Cherry Hill against the payment bond Sureties, a stay is inappropriate for the added reason that the subcontract between Cherry Hill and Grunley does not contain any language in which Cherry Hill waives its rights to proceed under the Miller Act.  The law is clear that under the Miller Act, the right to sue the prime contractor and its Sureties may be waived only by "clear and express provisions". *United States v. Phoenix General Construction Company*, 462 F.2d 1098, 1099 (4th Cir. 1972).[9]  In *Phoenix General*, the  Fourth Circuit observed "no such waiver … either express or implied" in a subcontract which stipulated that all disputes between the general and subcontractor must be submitted to the government and administratively decided before filing suit against the general. *Id.*    Therefore, the Court affirmed the decision of the district court, which denied the general contractor's motion to stay prosecution of the Miller Act claims until an administrative decision was rendered by the government.

Similarly, in *United States v. Gulf Insurance Company*, 650 F. Supp. 557 (S.D. Fla. 1986), the Court denied the surety's motion for stay pending administrative proceedings for arbitration.  The Court noted that a subcontractor is bound by a disputes clause incorporated into the subcontract by reference to the general contract "only if the

---

[9] A waiver of a right to sue on a Miller Act bond is invalid unless executed <u>after</u> the claimant furnishes the labor or materials to the project.  28 U.S.C. §3133(c).

Subcontract contains a provision making the disputes clause expressly applicable <u>and waiving the Miller Act remedy</u>." Emphasis added; *Id.* at 558. [10]

The rationale underlying the above decisions was discussed in *Washington Metropolitan Area Transit Authority v. Norair Engineering Corporation*, 553 F.2d 233 (D.C. Cir. 1977). The Court in *Norair* explained that because the policy underlying payment bonds is to protect subcontractors who provide labor or materials to a public contract that is not subject to attachment, "(i)n the absence of express contractual language, it cannot be assumed that the subcontractor intended to forfeit or condition his right to recover on the bond. The speculative judicial economy that may result if the claims are satisfactorily resolved through the administrative process does not override this consideration." *Id.* at 235. Based on this rationale, the Court in *Norair* rejected the general contractor's motion to stay the bond action pending adjudication of the general contractor's claims with the government, and for the same reason, this Court should deny the motion to stay filed herein by Grunley.

In support of the proposition that Miller Act suits should be stayed pending completion of dispute procedures, Grunley cites several cases which are all distinguishable from the case at hand. In three of the cases cited by Grunley -- *United States f/u/b/o MPA Construction, Inc. v. XL Specialty Insurance Company*, 349 F.Supp. 2d 934 (D.Md. 2004), *United States v. David Boland, Inc.*, 922 F.Supp. 597 (S.D.Fl. 1996) and, *U.S. v. Bencor-Petrifond*, 2007 WL 1725468 (N.D. Ill. 2007) -- the Courts

---

[10] For the type of language required to invoke the waiver, see *United States f/u Nova Enterprises, Inc. v. Reliance Insurance Company,* 1992 WL 296346 (4th Cir. 1992), in which the subcontract expressly stated that the subcontractor "waives and releases … all claims under any bond, now existing, or that may hereafter arise, for the Work under this Agreement."

followed the mandates of the Federal Arbitration Act ("FAA") in staying a subcontractor's claim pending the conclusion of <u>arbitration</u> between the prime contractor and the owner.  In contrast, Grunley's dispute with the owner is pending in the Federal Court of Claims, not before an arbitrator; therefore, the FAA policy of favoring arbitration agreements, which underlies the stays granted in the cases cited by Grunley, has no bearing or relevance.

Grunley also cites in its motion *United States v. Dick/Morganti*, 2007 WL 3231717 (N.D.Cal. 2007).  The Court in that case stayed the subcontractor's Miller Act claim pending resolution of the claims process being pursued by the general contractor with the government.  However, the Court reached that conclusion because in the subcontract, the subcontractor expressly agreed "to stay any action filed by the Subcontractor until the dispute resolution and appeals process between the Contractor and the Owner is exhausted."  In granting the stay, the Court stated that "where the unambiguous language of a subcontract provides for a stay, enforcing that language does not contravene the purposes of the Miller Act." *Id.* at p. 2.  The Subcontract between Cherry Hill and Grunley does not contain any language providing for a stay of Cherry Hill's Miller Act claim, and consequently, neither the decision in *Dick/Morganti*, nor any other legal theory, justifies abrogating Cherry Hill's rights under the Miller Act, and granting the stay requested by Grunley.

## <u>CONCLUSION</u>

Almost a year and a half has passed since Cherry Hill provided labor and materials to the project as directed by Grunley.  To date, the work remains unpaid notwithstanding that (a) the work was performed with the expectation that Grunley would

promptly pay Cherry Hill for it work at the prices agreed upon by the parties as reflected in the contemporaneous documentation; (b) Grunley has in fact been paid for many of the work items by the owner; and (c) the bulk of the claims for which Cherry Hill seeks recovery from Grunley are not included in the litigation which is pending between Grunley and the Owner before the Court of Federal Claims, and those claims which are included had previously been agreed to be paid by Grunley. In light of these facts, it is clear that Cherry Hill is entitled to obtain legal recourse for its claims directly against Grunley and the Sureties without having to await the outcome of Grunley's litigation against the Owner, and accordingly, the motion to stay should be denied.

Respectfully Submitted,


_____/s/ Joseph C. Kovars_____
Joseph C. Kovars
jckovars@ober.com
Jay Bernstein
jbernstein@ober.com
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 E. Baltimore Street
Baltimore, MD 21202-1643
(410) 685-1120 (telephone)
(410) 547-0699 (facsimile)

Counsel for Cherry Hill Construction, Inc.

| PAYMENT BOND (See instructions on reverse) | DATE BOND EXECUTED (Must be same or later than date of contract) December 5, 2003 | FORM APPROVED OMB NO 9000-0045 BOND NO 400SU11001 / 929310522 |
|---|---|---|

Public reporting burden for this collection of information is estimated to average 25 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (VRS), Office of Federal Acquisition Policy, GSA, Washington, D.C. 20405; and to the Office of Management and Budget, Paperwork Reduction Project (9000-0045), Washington, D.C. 20503.

**PRINCIPAL (Legal name and business address)**

Grunley-Walsh Joint Venture, LLC
11910 Parklawn Drive, Suite U
Rockville, MD 20852

**TYPE OF ORGANIZATION ("X" one)**

☐ INDIVIDUAL    ☐ PARTNERSHIP
☐ JOINT VENTURE    ☒ CORPORATION

**STATE OF INCORPORATION**
MD

**SURETY(IES) (Name(s) and business address(es))**

St. Paul Fire and Marine Insurance Company, 14120
Newbrook Drive, Suite 160, Chantilly, VA
20151-2223 and The Continental Insurance Company, 6021
University Boulevard, Suite 500, Ellicott City, MD 21043

**PENAL SUM OF BOND**

| MILLION(S) | THOUSAND(S) | HUNDRED(S) | CENTS |
|---|---|---|---|
| 13 | 993 | 216 | 00 |

**CONTRACT DATE**
12/05/03

**CONTRACT NO.**
1443CX305998901,
Task Order No. 35

**OBLIGATION:**

We, the Principal and Surety (ies), are firmly bound to the United States of America (hereinafter called the Government) in the above penal sum. For payment of the penal sum, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally. However, where the Sureties are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only for the purpose of allowing a joint action or actions against any or all of us. For all other purposes, each Surety binds itself, jointly and severally with the Principal, for the payment of the sum shown opposite the name of the Surety. If no limit of liability is indicated, the limit of liability is the full amount of the penal sum.

**CONDITIONS:**

The Above obligation is void if the Principal promptly makes payment to all persons having a direct relationship with the Principal or a subcontractor of the Principal for furnishing labor, material or both in the prosecution of the work provided for in the contract identified above, and any authorized modifications of the contract that subsequently are made. Notice of those modifications to the Surety(ies) are waived.

**WITNESS:**

The Principal and Surety(ies) executed this payment bond and affixed their seals on the above date.

| PRINCIPAL | | | | |
|---|---|---|---|---|
| Grunley-Walsh Joint Venture, LLC | | | | |
| SIGNATURE(S) | 1. (Seal) | 2. (Seal) | 3. (Seal) | Corporate Seal |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | 3. | |

| INDIVIDUAL SURETY(IES) | | | |
|---|---|---|---|
| SIGNATURE(S) | 1. (Seal) | 2. (Seal) | |
| NAME(S) (Typed) | 1. | 2. | |

| CORPORATE SURETY(IES) | | | |
|---|---|---|---|
| SURETY A | St. Paul Fire and Marine Insurance Company | STATE OF INC. | LIABILITY LIMIT |
| NAME & ADDRESS | 14120 Newbrook Drive, Suite 160 Chantilly, Virginia 20151-2223 | MN | $ 284,616,000 |
| SIGNATURES | 1. | 2. | Corporate Seal |
| NAME(S) & TITLE(S) (Typed) | 1. Stephen A. Spencer Attorney-In-Fact | 2. | |

STANDARD FORM 25-A    (REV 1-50)
Prescribed by GSA – FAR (48 CFR) 53.228(c)

NSN 7540-01-152-8061.
Previous edition not usable



PLAINTIFF'S
EXHIBIT
1

## CORPORATE SURETY(IES) (Continued)

| SURETY B | The Continental Insurance Company 6021 University Boulevard, Suite 500 Ellicott City, Maryland 21043 | | STATE OF INC. NH | LIABILITY LIMIT 473,109,000 | Corporate |
|---|---|---|---|---|---|
| NAME & ADDRESS | | | | | |
| SIGNATURES | 1. | 2. | | | Seal |
| NAME(S) & TITLE(S) (Typed) | Stephen A. Spencer Attorney-in-Fact | 2. | | | |
| SURETY C | | | STATE OF INC. | LIABILITY LIMIT | |
| NAME & ADDRESS | | | | | Corporate |
| SIGNATURES | 1. | 2. | | | Seal |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | | |
| SURETY D | | | STATE OF INC. | LIABILITY LIMIT | |
| NAME & ADDRESS | | | | | Corporate |
| SIGNATURES | 1. | 2. | | | Seal |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | | |
| SURETY E | | | STATE OF INC. | LIABILITY LIMIT | |
| NAME & ADDRESS | | | | | Corporate |
| SIGNATURES | 1. | 2. | | | Seal |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | | |
| SURETY F | | | STATE OF INC. | LIABILITY LIMIT | |
| NAME & ADDRESS | | | | | Corporate |
| SIGNATURES | 1. | 2. | | | Seal |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | | |
| SURETY G | | | STATE OF INC. | LIABILITY LIMIT | |
| NAME & ADDRESS | | | | | Corporate |
| SIGNATURES | 1. | 2. | | | Seal |
| NAME(S) & TITLE(S) (Typed) | 1. | 2. | | | |

### INSTRUCTIONS

6. This form, for the protection of persons supplying labor and material, is used when a payment bond is required under the Act of August 24, 1935, 49 Stat. 793 (40 U.S.C. 270a-270e). Any deviation from this form will require the written approval of the Administrator of General Services.

7. Insert the full legal name and business address of the Principal in the space designated "Principal" on the face of the form. An authorized person shall sign the bond. Any person signing in a representative capacity (e.g., an attorney-in-fact) must furnish evidence of authority if that representative is not a member of the firm, partnership, or joint venture, or an officer of the corporation involved.

8. (a) Corporations executing the bond as sureties must appear on the Department of the Treasury's list of approved sureties and must act within the limitation listed therein. Where more than one corporate surety is involved, their names and addresses shall appear in the spaces (Surety A, Surety B, etc.) headed "CORPORATE SURETY(IES)." In the space designated "SURETY(IES)" on the face of the form, insert only the letter identification of the sureties. (b) Where individual sureties are involved, a completed Affidavit of Individual Surety (Standard Form 28), for each individual surety shall accompany the bond. The Government may require the surety to furnish additional substantiating information concerning its financial capability.

9. Corporations executing the bond shall affix their corporate seals. Individuals shall execute the bond opposite the word "Corporate Seal", and shall affix an adhesive seal if executed in Maine, New Hampshire, or any other jurisdiction requiring adhesive seals.

10. Type the name and title of each person signing this bond in the space provided.

STANDARD FORM 25-A (REV. 1-90) BACK

**St Paul Surety**
Fire and Marine Insurance Company    United States Fidelity and Guaranty Company
Paul Guardian Insurance Company      Fidelity and Guaranty Insurance Company
Paul Mercury Insurance Company       Fidelity & Guaranty Insurance Underwriters, Inc.
Seaboard Surety Company              St. Paul Medical Liability Insurance Company

Bond No. 400SU1001

### RIDER CONTAINING
### DISCLOSURE NOTICE OF TERRORISM COVERAGE

This disclosure notice is required by the Terrorism Risk Insurance Act of 2002 (the "Act"). No action is required on your part. This Disclosure Notice is incorporated in and a part of the attached bond, and is effective the date of the bond.

You should know that, effective November 26, 2002, any losses covered by the attached bond that are caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by the Act. Under this formula, the United States reimburses 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

Under the Act, there is a cap on our liability to pay for covered terrorism losses if the aggregate amount of insured losses under the Act exceeds $100,000,000,000 during the applicable period for all insureds and all insurers combined. In that case, we will not be liable for the payment of any amount which exceeds that aggregate amount of $100,000,000,000.

The portion of your premium that is attributable to coverage for acts of terrorism is **$0.00.**

IMPORTANT NOTE: THE COST OF TERRORISM COVERAGE IS SUBJECT TO CHANGE ON ANY BONDS THAT PREMIUM IS CHARGED ANNUALLY.

# NOTICE

In accordance with the Terrorism Risk Insurance Act of 2002, we are providing this disclosure notice for bonds and certain insurance policies on which one or more of the Writing Companies identified below is the surety or insurer.

To principals on bonds and insureds on certain insurance policies written by any one or more of the following companies (collectively the "Writing Companies") as surety or insurer: Western Surety Company, Universal Surety of America, Surety Bonding Company of America, Continental Casualty Company, National Fire Insurance Company of Hartford, American Casualty Company of Reading, PA, The Firemen's Insurance Company of Newark, NJ, and The Continental Insurance Company.

## DISCLOSURE OF PREMIUM

The premium attributable to coverage for terrorist acts certified under the Act was Zero Dollars ($0.00).

## DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES

The United States will pay ninety percent (90%) of covered terrorism losses exceeding the applicable surety/insurer deductible.

Form F7310

TOTAL P.008

*Subcontract #03096CHER001*

# Grunley-Walsh                              SUBCONTRACT AGREEMENT

SUBCONTRACT AGREEMENT MADE BETWEEN

THE CONTRACTOR:_____**GRUNLEY-WALSH JOINT VENTURE, LLC**_____ AND

THE SUBCONTRACTOR:_____**CHERRY HILL CONSTRUCTION**_____

ADDRESS_____**8211 WASHINGTON BLVD JESSUP MD, 20791-0356**_____

PHONE No.:_____**(410) 799-3577**_____ FAX No.:_____**(410)799-5483**_____

## 1. THE PROJECT

| | | | |
|---|---|---|---|
| G-W JOB NO.: | 03-096 | JOB INFO PACKAGE ENCLOSED: | Yes  X |
| COST CODE: | 02-100 | NTP: | |
| CONTRACT NO.: | 1443C3059980901 – Task Order No. 35 – Mobilization Phase | | |
| OWNER: | National Capitol Parks-Central | | |
| JOB NAME: | Washington Monument Design and Construction | | |
| LOCATION: | Washington Monument, Washington, DC | | |

**PLAINTIFF'S EXHIBIT 2**

## SCOPE OF WORK

2.  Subcontractor warrants that it is thoroughly familiar with the site conditions and the Prime Contract Documents and that the Subcontractor shall furnish anything necessary to complete in place the to complete in place the **Site Work/Site Survey/concrete/Bollards /Add Alternated List** work as set forth below in strict accordance with the Prime Contract Documents including plans, specifications, attachments, general provisions, general and special conditions.

### INCLUDES:

- Add Alternate #4 – Concrete Wall, Add Alternate #5 – Concrete Paving, Add Alternate #10 Crowd control sockets and Concrete Light Vaults.
- Quantity deduction of the slot drains and light vaults shall be negotiated with Cherry Hill Contracting.
- This is a firm fixed no change order contract.   **\* See below.**

Grunley-Walsh reserves the exclusive and sole right to exercise all remaining contract options as described in the prime contract documents and as listed below:

<None>

Also included are all security and safety requirements, compliance with federal, state and local regulations, OSHA and the **National Park Services** regulations, submittal of certified Payroll, submittals, samples, surveys, transportation of your personnel, materials and equipment, coordination with Grunley-Walsh Joint Venture and other trades, participation in scheduling, protection of existing elements and quality control.

### Flow-Down Relationship

3.  The Subcontractor is bound to the Contractor in the same way the Contractor is bound to the Owner and shall assume toward the Contractor all the obligations and responsibilities which the Contractor assumes toward the Owner and shall have the benefit of all rights, remedies and redress against the Contractor, pursuant to the Prime Contract, has against the Owner, except that this Subcontract shall govern any inconsistent provision of the Prime Contract.

### THE SUBCONTRACT SUM

4.  The Contractor shall pay the Subcontractor for the performance of this *Subcontract Six Million Fifty Four Thousand Eight Hundred Fifty Nine Dollars /zero cents ($6,054,859.00)* in partial payments as hereinafter described.

**\* Subcontractor shall work diligently with the Contractor to minimize the cost to the Contractor due to changes in the work being performed by the Subcontractor. The Subcontractor is not and was not a part of the design phase of this project, therefore, additive and deductive change orders will be negotiated. This paragraph supersedes Article 3, Flow-Down Relationship, where applicable, i.e. design/build.**

*Subcontract #03096CHER001*

## Price And Payment

5. The Subcontract price shall be paid in partial payments, when received by the Contractor from the Owner, to Subcontractor for the payment for work in place and material on jobsite. Payment from the Owner is a specific condition precedent to the Contractor's obligation to pay the Subcontractor, the risks of nonpayment by the Owner being on the Subcontractor for its portion of the work in place or material on the job site. Ten percent (10%) retention shall be withheld until final payment is due except that retainage will be reduced when and to the extent the Owner's retainage withheld from the Contractor is reduced. Final payment shall be due after completion of all work, acceptance by the Owner, compliance with all Subcontract obligations, and receipt of final payment from the Owner, which items shall be conditions precedent to the making of final payment to Subcontractor. The Contractor is entitled to proof of payment for labor, material and services used before any payment is due. Material paid for shall belong to the Contractor, but shall remain in the care, custody and control of Subcontractor and be stored at Subcontractor's risk. The Subcontractor shall be responsible at all times for his labor and/or materials until same is accepted by the Owner. Subcontractor shall furnish guarantees and all other documents required by the Prime Contract for the Subcontractor's work, including releases of all claims and liens as a condition precedent for final payment. Partial releases may be required at the Contractor's option as a condition precedent to any partial payments for work completed and the Contractor may require the Subcontractor to certify and/or exhibit such other evidence that all entities furnishing labor, materials, and equipment under prior requisitions have been paid in full. Liquidated damages withheld by Owner will be assessed against Subcontractor for delay attributable to Subcontractor's fault. The Subcontractor shall itemize the Subcontract price as a basis for establishing value of work completed, and partial payments. Subcontractor agrees that it will not be paid by the Contractor for work and materials in place until ten (10) days after the Contractor's receipt of payment from the Owner. If the Contractor withholds making payment to the Subcontractor until the Subcontractor has complied with the aforesaid terms and conditions, the Subcontractor shall still diligently proceed with the work as required.

## Liability And Indemnity Insurance

6. The Subcontractor shall procure, at its sole cost and expense, the insurance coverages set forth below, and shall maintain such coverages in full force and effect as specified in this Paragraph. The Subcontractor shall include the Contractor [Grunley-Walsh] as an additional insured to the insurance policies described below. The insurance coverage afforded under the policies described herein shall be primary and non-contributing with respect to any insurance carried independently by the Contractor. All such insurance policies shall indicate that as respects the insured (whether named or otherwise), cross liability and severability of interests shall exist for all coverage's provided there under. In addition, all such insurance policies shall include a waiver of subrogation endorsement in favor of the additional insured. The insurance specified below shall be placed with insurance companies reasonably acceptable to Contractor, shall be written on an occurrence basis, and shall incorporate a provision requiring the giving of notice to Contractor at least thirty (30) days prior to the cancellation, non-renewal or material modification of any such policies. The Subcontractor shall promptly furnish the Contractor with certificates of insurance evidencing the insurance required hereunder, and shall not commence any services under this Agreement until such insurance is obtained.

(i)  Commercial General Liability Insurance. A broad form Commercial General Liability Insurance Policy in form and substance reasonably acceptable to the Contractor and including, without limitation, appropriate endorsements adding the following cover-ages: Premises and Operations Liability; Explosion, Collapse and Underground Damage Liability; Personal Injury Liability (with employee and contractual exclusions deleted); Broad Form Property Damage Liability; Contractual Liability supporting the Con-tractor's indemnification agreements in this Contract; Completed Operations and Products Liability for a period of not less than three (3) years following the Contractor's acceptance of the Project; and Independent Contractor's Protective Liability. The Commercial General Liability Insurance Policy must be written with a combined single limit of liability of not less than $1,000,000 for each occurrence of bodily injury and/or property damage and an annual aggregate of liability per project of not less than $2,000,000 for bodily injury and/or property damage, and an annual aggregate of liability of not less than $2,000,000 for Completed Operations and Products Liability.

(ii)  Comprehensive Automobile Liability Insurance. A Comprehensive Automobile Insurance Policy in form and substance reasonably acceptable to the Contractor [Grunley-Walsh]. The Comprehensive Automobile Liability Insurance Policy must provide coverage for all owned, hired, rented and non-owned automobiles, and must be written with a combined single limit of liability of not less than $1,000,000 for each occurrence of bodily injury and/or property damage.

(iii)  Worker's Compensation Insurance. A Worker's Compensation Insurance Policy in form and substance reasonably acceptable to the Contractor and in an amount not less than the statutory limits (as may be amended from time to time), including Employees Liability Insurance with limits of liability of not less than (i) $500,000 for bodily injury by accident, each accident, (ii) $500,000 for bodily injury by disease, each employee, and (iii) $500,000 aggregate liability for disease.

(iv)  Property Insurance. A Property Insurance Policy covering all materials, equipment and other portions of the Work stored off-site or in transit; it being expressly acknowledged and agreed by the Contractor that it shall assume responsibility for any loss or damage to such property.

(v)  Umbrella Liability Insurance. An Umbrella Liability Insurance Policy in form and substance reasonably acceptable to the Contrac-tor [Grunley-Walsh] written in excess of the coverages provided by the insurance policies described above in subsections (i),(ii) and the Employer's Liability in (iii). The Umbrella Liability Insurance Policy must be written with a combined single limit not less than $5,000,000 for each occurrence of bodily injury and/or property damage, and an annual aggregate of liability of not less than $5,000,000 for bodily injury and/or property damage.

The Contractor shall not insure nor be responsible for any loss or damage to tools, equipment or other property of any kind owned, rented or leased by the Subcontractors, sub-subcontractors, or their respective employees or agents.

*Subcontract #03096CHER001*

To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Owner, Contractor, Architect, Architect's consultants and agents and employees of any of them from and against all injuries, claims, damages, losses and expenses, including but not limited to attorney's fees, arising directly or indirectly out of the obligations herein undertaken or resulting out of operations conducted by the Subcontractor, the Subcontractor's Sub-subcontractors, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such injury, claim, damage, loss or expenses is caused in part by a party indemnified hereunder, save and except claims or litigation caused by or resulting from the sole negligence of the party indemnified hereunder.

## Bonds <Not Required for this contract from Grunley-Walsh>

7.  The Subcontract shall furnish performance and payment bonds in a form satisfactory to the Contractor and in the Department of the Treasury's approved sureties list, in an amount equal to the Subcontract sum, which bonds shall carry the surety's consent to changes in price and time of performance necessary to conform to Prime Contract requirements. Furnishing of said bonds shall be a condition precedent to the Contractor's obligation to release partial payments.

## Shop Drawings, Samples, And Data Submissions

8.  All submittals such as shop drawings, catalogs, samples and material lists required by Prime Contract, which pertain to this work, shall be furnished in a complete and timely manner. Subcontractor shall be responsible for delays because of failure to do so and for any deviation from plans and specifications. All deviations from the Prime Contract documents must be noted clearly on the submittals, and by separate cover letter the Subcontractor shall state reasons for the deviation and refer to the applicable contract provision. The complete set of submissions for this Subcontract work shall be submitted by the Subcontractor to the Contractor within thirty (30) days from the date of this Subcontract, unless otherwise stated in the Contractor's Schedule of Progress. Approval by the Owner or the Contractor does not constitute a waiver or modification of the Prime Contract requirements.

## Time Is Of The Essence

9.  Time is of the essence. The Contractor has the right to direct the manner in which the Subcontractor performs its work. Subcontractor shall proceed with the performance of the work at such time and in such sequence as the Contractor may direct and/or as required by the Schedule of Progress, which may be updated and revised from time to time by the Contractor as working conditions require, including overtime or shift work performance as necessary. If overtime or additional shifts are required solely to accelerate project completion through no fault of the subcontractor, it shall be authorized in writing prior to such acceleration effort and be paid for by the Contractor. Payments due may be withheld to insure timely progress and completion of work. The Subcontractor shall be liable for all losses and damages incurred by the Contractor (including consequential damages) due to inexcusable delays of the Subcontractor in the performance of the work, including delay costs not reimbursable from the Owner due to concurrent, inexcusable delays of the Subcontractor.

## Extensions Of Time

10.  Subcontractor shall be entitled to an extension of time for performing and completing the work covered by this subcontract upon the same terms and conditions an extension of time is allowable under the Prime Contract, and only to the extent that an extension of time is actually granted to the Contractor by Owner, or its representative under the Prime Contract. The Subcontractor shall give notice of the excusable delay to the Contractor in writing within three (3) calendar days from the beginning of said delay in order that the Contractor may in turn notify the Owner. If notice is not given timely, said excusable delay may be considered waived. The Owner's decision, or its representative's, with regard to the delay, including the assessment of liquidated damages, shall be binding upon and chargeable to the Subcontractor, subject to the disputes procedure provided in the Prime Contract.

## Damages For Delay

11.  The Contractor shall not be independently liable to Subcontractor for any unforeseeable delay or interference occurring beyond the Contractor's control or for delay or interference caused by Owner or other subcontractors or suppliers. Subcontractor shall only be entitled to reimbursement for any damages for delays recovered on its behalf by the Contractor from the Owner or others. The Subcontractor shall have the right, at its expense, to exercise all provisions of the Prime Contract to recover said damages against the Owner. In the event that the Contractor seeks to recover damage for delay against the owner or others and the Subcontractor participates in such claim, the Subcontractor shall be responsible for its pro rata share of any legal expert or other expenses in presenting and/or prosecuting the overall claims. The Contractor shall have the right, at any time and for any reason, to delay or suspend the whole or any part of the work herein. A time extension shall be the sole and exclusive remedy of the Subcontractor for delays or suspensions caused by Contractor, even if the delays or suspensions were: (1) of a kind not contemplated by the parties, (2) amounted to an abandonment of the contract, or (3) were caused by active interference.

## Schedule

12.  The Contractor may schedule this project using CPM Schedule techniques and/or simple bar charts. Subcontractor agrees to meet with the Contractor and to provide the necessary detailed information to properly depict activities, including their costs and duration, at no additional cost to the Contractor. All such data shall be provided within fifteen (15) days of the Contractor's written notice and request. The Contractor may at its option withhold making payments to the Subcontractor until the Subcontractor has provided said information. The Contractor may modify and change the schedule from time to time as it deems appropriate in accordance with actual performance conditions. Subcontractor shall perform the work as directed by such schedules as expeditiously as possible despite any pending disputes.

## Default Termination

13.  The following events determined by the good faith judgment of the Contractor shall be deemed a breach of this Agreement by the Subcontractor: Failure to expeditiously prosecute and complete the whole or any part of the work in accordance with the current Schedule of Progress and/or directions from the Contractor, failure to pay for labor and material, payroll taxes, contributions or insurance premiums; interference with the performance of work by others for any reason; act of bankruptcy or insolvency; or any other material failure to fulfill obligations of this Subcontract or of the Prime Contract concerning the Subcontractor's work or responsibilities. If the Subcontractor



breaches the Subcontract, the Contractor may terminate Subcontractor's right to proceed upon three (3) days written notice. In the event that the Contractor believes in good faith that the work is being endangered by the Subcontractor's failure to prosecute the work or take action, such written notice may be omitted and the Subcontractor's performance in whole or in part may be immediately terminated. The Contractor may then have the work completed and may use Subcontractor's material, supplies, ~~tools and equipment~~ to complete. Subcontractor and its surety shall continue to be liable for all costs to complete and any damages and expenses including reasonable counsel fees, liquidated damages assessed by owner and other liabilities which may result from the default and breach, without waiver of any other rights or remedies available to the Contractor, including right of setoff and collection of any funds which may be due Subcontractor under other subcontracts with the Contractor. If the Contractor wrongfully exercises its default option under this Article, the Subcontractor's remedy shall be solely and exclusively under Article 27, Termination for Convenience.

The Subcontractor agrees that in the event the Contractor is terminated for default by the Owner, all disputes relating to or arising out of the Subcontract shall be stayed pending the final resolution of the Contractor's termination for default in accordance with the administrative and/or judicial disputes procedures in the prime contract. The Subcontractor further agrees that all payment bond actions by the Subcontractor against the Contractor shall be stayed pending the final resolution of the Contractor's termination for default. In the event that the Owner's termination for default of the Contractor is upheld, the Subcontractor agrees that the amount of any recovery the Subcontractor is entitled to from the Contractor shall be limited to the recovery allowed pursuant to Article 27, Termination for Convenience.

## Extra Work

14. The Contractor may at any time direct the Subcontractor to perform extra work or changes under this Subcontract. Only extra work authorized by the Contractor as an extra or change in writing shall be paid for by the Contractor. If the extra work direction does not originate from Owner's direction and there is no prior agreement on price, then Subcontractor shall be paid for the actual direct costs of said work plus fifteen percent (15%) for overhead, profit, supervision and small tools, which will constitute the entire amount due the Subcontractor for the extra work, including any impact or delay effect.

## Owner Changes

15. Changes ordered by Owner shall be performed and paid for in accordance with the terms of the Prime Contract, including all rights of dispute and appeal, provided reservation and exercise of said rights to not interfere with the progress of the work. Payment for Owner changes shall be made in accordance with Paragraph 5, Price and Payment, and payment for Owner changes shall not be due the Subcontractor as a specific condition precedent until the Contractor from the Owner receives said payment.

## Contract Interpretation

16. The Contractor's interpretation of contract requirements shall be binding upon Subcontractor and complied with, except that Subcontractor shall have the right to claim adjustment of the contract because of said interpretation, if said claim is made in writing within forty-eight (48) hours after ruling and direction.

## Disputes

17. Disputes arising out of Owner acts, omissions or responsibilities shall be resolved in accordance with the disputes procedures in the Prime Contract. Subcontractor shall have the right to exercise the Contractor's rights at the Subcontractor's sole cost and shall be bound thereby. The Contractor shall have no direct liability to the Subcontractor except to give the Subcontractor the opportunity to exercise his rights in the Prime Contract. The Subcontractor shall be required as a condition precedent to submitting a claim against the Owner to certify its claim in accordance with all certification requirements in the Prime Contract. Subcontractor agrees to indemnify and hold harmless the Contractor for any defects or misrepresentations in its certifications, including any relating to cost or pricing data. In the event that arbitration is provided for in the Prime Contract for disputes between the Owner and the Contractor, Subcontractor specifically agrees to submit its disputes arising out of said Owner acts, omissions or responsibilities in any arbitration proceeding between the Owner and the Contractor. Subcontractor shall be given the opportunity to confer with the Contractor in the selection of arbitrators in the Contractor's name. All disputes between the Contractor and Subcontractor, not involving the Owner's acts, omissions or responsibilities shall, at the contractor's sole option, be resolved by arbitration in accordance with the rules of the American Arbitration Association. Subcontractor specifically agrees that any such arbitration proceedings shall, at the Contractor's sole option, be consolidated with any arbitration proceedings between the Contractor and any other party. Subcontractor specifically agrees that any dispute with the Owner or the contractor shall not interfere with Subcontractor's progress of its work in any manner, and that Subcontractor shall proceed with its work as ordered, subject to claim. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. The award rendered by the arbitrators shall be final, and judgment may be entered upon it in any court having jurisdiction thereof. Any such award shall be binding and enforceable against any persons, surety and/or bonding company, which guarantee the performance by the Subcontractor of this Agreement in any manner.

## Backcharges

18. All charges and backcharges assessed by the Contractor against the Subcontractor shall be deemed accepted by Subcontractor unless rejected in writing within thirty (30) days. The Contractor is authorized to deduct and offset from any payments due Subcontractor an amount equal to any and all sums, obligations, liabilities, backcharges, claims (liquidated or unliquidated) owed by Subcontractor to Contractor arising under this Subcontract or any other contract or agreement between the Subcontractor and the Contractor.

## Plant And Cleanup

19. Subcontractor shall provide its own plant and facilities, including scaffolding and hoists, do its own cleanup, and repair or replace damaged, defective and defaced work caused by its own negligence. The Subcontractor shall cleanup and remove from the site all of its rubbish, debris, etc. on a daily basis, unless the Contractor directs otherwise. Upon completion of the subcontract work, all Subcontractor's materials, equipment, etc. must be immediately removed from the jobsite by Subcontractor. Failure to comply will permit the Contractor to do so and backcharge Subcontractor for the cost. If Subcontractor uses the Contractor's hoist, scaffolding or facilities, it will be responsible for the

4

operating expenses of such equipment when in use for Subcontractor's benefit.

## Bankruptcy And Delinquent Taxes

20.  In the event of any act of bankruptcy insolvency by the Subcontractor or notice of levy involving delinquent taxes owed by Subcontractor, the contractor shall have the right to withhold payments and apply the same to secure performance of the Subcontract without prejudice to al other rights against Subcontractor or its surety.

## Responsibility For Work In Place

21.  The Subcontractor shall check all work performed by others necessary to "receive" the Subcontractor's work.  Failure to give notice of any discrepancy shall relieve the Contractor of any responsibility therefore. The Subcontractor shall be responsible for all field measurements and shall check elevations and grades to insure proper fitting of its work.  It shall not be incumbent upon the Contractor to discover any mistakes, errors, omissions or deviations from the contract requirements in the subcontract drawings, and the Owner's final approval of drawings made by the Subcontractor shall not relieve the Subcontractor from responsibility for unauthorized changes, deviations or omissions or for error of any sort in its drawings.

## Licenses And Fees

22.  Subcontractor shall be responsible for all taxes, permits, licenses and fees necessary to perform its work, including any increase therein, if any, during the life of the Subcontract.

## Labor Force

23.  Subcontractor shall be responsible for performance regardless of any interference of any trades council or other labor or union organization.  Any work stoppage by employees which will in the opinion of the Contractor unreasonably delay the work will be a breach of the Subcontract subject to the rights set forth in Paragraph 13.  The Subcontractor shall immediately remove from the work such of his employees as the Contractor shall deem incompetent, careless, insubordinate or otherwise undesirable.  The Subcontractor shall employ at all times a sufficient number of workmen with sufficient equipment and proper materials which in the opinion of the Contractor shall be required to prosecute the work in a diligent and expeditious manner.

## Nondiscrimination

24.  Subcontractor shall not discriminate against any employee or applicant for employment, advancement, transfer, layoff or termination because of race, religion, color, sex or national origin. All Equal Opportunity or affirmative action requirements of the Prime Contract shall be obligations of the Subcontractor, including:

**Executive Order 11246, As Amended**
Part II - Nondiscrimination in Employment by Government Contractors and Subcontractors: Subpart B - Contractors' Agreements:
SEC. 202.  During the performance of this contract, the subcontractor agrees as follows:
(1) The subcontractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The subcontractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The subcontractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.
(2) The subcontractor will, in all solicitations or advancements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.
(3) The subcontractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.
(4) The subcontractor will comply with all provisions of Executive Order No. 11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.
(5) The subcontractor will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.
(6) In the event of the subcontractor's noncompliance with the nondiscrimination clauses of this contract or any of such rules, regulations, or orders, this contract may be cancelled, terminated, or suspended in whole or in part and the subcontractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.
(7) The subcontractor will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The subcontractor will take such action with respect to any subcontract or purchase order as may be directed by the Secretary of Labor as a means of enforcing such provisions including sanctions for noncompliance: Provided, however, that in the event the subcontractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction, the subcontractor may request the United States to enter into such litigation to protect the interests of the United States."

### Superintendence

25. Subcontractor shall employ full-time on the jobsite a competent Superintendent, satisfactory to the Contractor with full authority to act on Subcontractor's behalf. The Contractor shall have the right to require the Subcontractor to replace the Superintendent if, in the opinion of the Contractor, the Subcontractor's Superintendent is not satisfactorily performing the work.

### Patent Infringement

26. Subcontractor shall indemnify the Contractor from any use or infringement of patents.

### Termination For Convenience

27. Contractor shall have the right to terminate this Agreement for its own convenience for any reason by giving notice of termination effective upon receipt thereof by Subcontractor. Termination for default under Paragraph 13, if wrongfully made, shall be treated as a termination for convenience. Settlement with the Subcontractor shall be accomplished in accordance with the provisions of the Termination for Convenience clause in the Prime Contract. If the Termination for Convenience clause in the Prime Contract is not applicable, the Subcontractor shall only be paid either the actual cost for work and labor in place, plus fifteen percent (15%), or a pro rata percentage of the Subcontract amount equal to the percentage of completion for the Subcontractor's work as approved by the Contractor, whichever is less. Subcontractor shall not be entitled to anticipated profits on unperformed portions of the work

### Assignment

28. No assignment hereunder, including an assignment of proceeds due or to become due to the Subcontractor is allowed without prior written approval of the Contractor.

### Notices

29. All notices required under this Subcontract or the Prime Contract shall be addressed to Contractor's office located at 11910 Parklawn Dr., Suite U, Rockville, MD 20852. Notices required by the various provisions of the Prime Contract (not otherwise dealt with herein) shall be due in the Contractor's office in one-half (½) the time specified in the Prime Contract so that Contractor will have sufficient time to forward its notice within the required period. Failure of Subcontractor to forward notices in a timely manner as required by the various equitable adjustment provisions of the Prime Contract shall operate to waive its rights to any such adjustments if the Owner rejects the claim.

### Owner Approval

30. This Agreement is contingent upon Subcontractor or its product being approved by the Owner. If a disqualification occurs because of failure to comply with and strictly fulfill the obligations herein, said failure shall be deemed a breach by the Subcontractor. Any other rights of disqualification by Owner shall render this Agreement null and void.

### Recitation, Severability, And Waiver

31. Attachments are part of this Agreement. If this Agreement is retained by Subcontractor without executing and returning same within fifteen (15) days, it shall be deemed accepted; however, acceptance in writing is a condition precedent to payment due hereunder. The Subcontractor shall not deal directly with or work directly for Owner. This instrument is the entire Agreement between the parties. If any provision herein is held to be invalid by any competent court, the remaining Agreement shall survive. This Agreement shall control any inconsistency in any documents referred to or incorporated by reference. It is further agreed that no action or failure to act by the Contractor shall constitute a waiver of any breach of any term or condition in the Agreement or any subsequent breach thereof, not shall such action or failure to act constitute a waiver of any right offered Contractor under this Agreement.

### OSHA

32. Subcontractor shall comply with OSHA and any other relevant and applicable federal, state and local safety regulations, standards and requirements. Subcontractor shall indemnify Contractor from any failure to comply with these requirements including fines and abatement costs and delays to project. Failure to comply shall be a breach of contract, subject to provisions of Paragraph 13.

### Liquidated Damages

33. In the event that liquidated damages are assessed against the Contractor and it is determined that Subcontractor is responsible to the Contractor for said liquidated damages, then Subcontractor shall pay to the Contractor liquidated damages in addition to any damages incurred by the Contractor as the result of Subcontractor's failure of performance.

### Mechanic's Liens

34. Subcontractor hereby waives it right to any mechanic's liens on the property of the Owner to the extent allowed by law.

### Execution

35. This subcontract must be executed by the Subcontractor and returned to the Contractor within fifteen (15) days of its receipt by the Subcontractor. Until the subcontract is executed and returned to the Contractor, along with any required bonds and certificates of insurance, the Contractor has the right to withhold any payment due the Subcontractor.

### Governing Law

36. This subcontract shall be governed by the laws of the State where Contractor has its principal office and any actions or lawsuits arising hereunder to the extent permitted by law shall be brought in the District where Contractor's principal office is located without regard to principles of conflict of laws or forum non-convenience.

Subcontract #03096CHER001

**CHERRY HILL CONSTRUCTION**
Subcontractor

_____
Signature

James A. Openshaw, Jr., President
Name & Title

Date:    2/23/04

**GRUNLEY-WALSH JOINT VENTURE**
Contractor

_____
Signature

**Loren D. Raap, General Manager**
Name & Title

Date: _____ 3-4-04 _____

*Subcontractor to sign and initial each sheet and return both copies of the Subcontract Agreement to the Contractor within fifteen days. The Contractor will then sign and return one copy for the Subcontractor's files.*

7
*Date 2/2/04*

IN THE UNITED STATES DISRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

CHERRY HILL CONSTRUCTION, INC.      *

        Plaintiff,                 *

v.                              *

GRUNLEY-WALSH JOINT VENTURE, LLC,  *    Case No. 8:07-cv-3476-AW
ST. PAUL FIRE AND MARINE INSURANCE
COMPANY, THE CONTINENTAL INSURANCE *    Judge Alexander Williams, Jr.
COMPANY

                               *

        Defendants               *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### AFFIDAVIT OF JERZY MYCKOW

1.     I, Jerzy Myckow, am over 21 years of age and competent to testify as a witness in this cause.

2.     I served as the Project Manager for Cherry Hill Construction, Inc. ("Cherry Hill"), on the Washington Monument and Design Project (the "Project") which was a National Park Service ("NPS") project performed by Cherry Hill under a subcontract with Grunley Walsh ("Grunley"). As such I have personal knowledge of the facts stated in this affidavit.

3.     Cherry Hill completed Contract work at the Project in December 2006.

4.     During the course of the Project, and at the direction of Grunley, Cherry Hill performed various items of additional work which were the subject of numerous individual "requests for change orders" ("RCO's") that, to date, have not been paid to Cherry Hill.



PLAINTIFF'S
EXHIBIT
**3**

5.    The outstanding changes include 34 RCO's that were acknowledged by Grunley and included in Change Order No. 7, which Grunley issued to Cherry Hill on March 28, 2006. The pricing of all but seven of the RCO's (which primarily involved disputed backcharges) were accepted and agreed to by Cherry Hill, and resulted in a $36,248 reduction to the contract price.

6.    On April 21, 2006, I attended a meeting with representatives of Grunley, at which Cherry Hill and Grunley agreed that the contract would be increased by $558,291 for work performed by Cherry Hill on 46 RCO's. This agreement is memorialized in a letter that I wrote to Grunley dated April 24, 2006, and was confirmed in an email from Grunley which also acknowledged several other RCO's totaling $39,912, and which promised to issue a change order for the outstanding RCO's. To date, a change order reflecting the agreements reached on April 21, 2006 has not been issued by Grunley.

7.    In addition to the RCO's listed in Change Order No. 7 and the RCO's listed in the letter of April 24, 2006, Grunley has not paid Cherry Hill for 19 other RCO's which have a total value of $678,345.

8.    Many of the RCO's for which Cherry Hill is owed payment from Grunley per the meeting of April 21, 2006 were the subject of contract modifications 6, 7 and 8, which were issued to Grunley by NPS. Grunley has received payment from the owner for these contract modifications, but has not paid Cherry Hill for the RCO's included in the modifications.

9.    I have reviewed the claims submitted by Grunley to NPS which are pending before the Court of Federal Claims. Most of the RCO's for which Cherry Hill seeks compensation in this litigation are not part of the case being prosecuted by Grunley in the Court of Federal Claims, or have already been settled and agreed upon between Cherry Hill and Grunley, In fact, 22 of the 25 outstanding Cherry Hill RCO's which are part of the Court of Federal Claims case

2

are those that Grunley agreed to pay Cherry Hill as per either Change Order No. 7 (6 RCO's) or the letter of April 24, 2006 (16 RCO's).

10.   The total amount currently owed by Grunley to Cherry Hill for outstanding RCO's is $1,240,300.   In addition, Grunley issued six change orders to Cherry Hill in the total of $380,985, which, together with the outstanding RCO's, increased the contract value to $7,676,144.   To date, Grunley has paid Cherry Hill $6,304,003, leaving a contract balance currently due and owing of $1,372,141.

I hereby swear and affirm, under the penalties of perjury, that the facts contained in this Affidavit are true and correct to the best of my knowledge.

Dated:   _3-14-08_            _Jerry Myckow_
                                        JERZY MYCKOW

3

# Grunley-Walsh, LLC

**CHANGE ORDER**
**No. 00007**

5010 Nicholson Lane
Suite 200
Rockville, MD  20852

**Phone:** 301-881-8081
**Fax:** 301-881-8083

**TITLE:**   Site Work/Concrete/Site Surevey/Bol

**DATE:** 3/28/2006

**PROJECT:** Washington Monument Const.Phase

**JOB:** 1443C3059980901◇G-W 03-0

**TO:**   Attn: Jerzy Yurek Myckow
Cherry Hill Construction
8211 Washington Blvd
Jessup, MD  20794
Phone: 410-799-3577 Fax: 410-799-9745

**CONTRACT NO:** 03096CHER001



**PLAINTIFF'S EXHIBIT 4**

**RE:**         **To:**              **From:**                    **Number:**

| Item | Description | Stock# | Quantity | Units | Unit Price | Tax Rate | Tax Amount | Net Amount |
|------|-------------|--------|----------|-------|------------|----------|------------|------------|
| 00001 | RCO 951.79 - Backcharge for Damage to Stone @ SW by equipment | | 1.000 | | ($2,475.00) | 0.00% | $0.00 | ($2,475.00) |
| 00002 | RCO 951.78 - Backcharge for Additional Brick Installation to Build up walls to accept stone | | 1.000 | | ($1,998.00) | 0.00% | $0.00 | ($1,998.00) |
| 00003 | 951.77 - Backcharge for damage Irrigation Valve Boxes during grading of site | | 1.000 | | ($8,816.00) | 0.00% | $0.00 | ($8,816.00) |
| 00004 | RCO 951.76 - Backcharge for West Flag Ple Bases out of Alignment | | 1.000 | | ($26,340.00) | 0.00% | $0.00 | ($26,340.00) |
| 00005 | RCO 951.75 - Backcharge for Damage to Elecrrical Conduit caused by excvation, areas were flagged and staked. | | 1.000 | | ($6,158.00) | 0.00% | $0.00 | ($6,158.00) |
| 00006 | RCO 951.73 - Demo existing light Pedestals | | 1.000 | | $4,182.00 | 0.00% | $0.00 | $4,182.00 |
| 00007 | RCO 951.71 - Remove existing footer@ lodge Plaza in conflict with proposed storm drain | | 1.000 | | $5,366.00 | 0.00% | $0.00 | $5,366.00 |
| 00008 | RCO 951.69 - Repair damaged 6" clean-out to Monument Light Vault | | 1.000 | | $630.00 | 0.00% | $0.00 | $630.00 |
| 00009 | RCO 951.65 - Repair Water line South along the Fence | | 1.000 | | $1,242.00 | 0.00% | $0.00 | $1,242.00 |
| 00010 | RCO 951.56 - Constitution Ave Tie-in - Utlity location test pitting and survey | | 1.000 | | $3,989.00 | 0.00% | $0.00 | $3,989.00 |
| 00011 | RCO 951.53 - Drain for Bollards | | 1.000 | | $2,615.00 | 0.00% | $0.00 | $2,615.00 |
| 00012 | RCO 951.49.05 - Remove other subcontractors spoils on May 16 and June 18, 2005 | | 1.000 | | $6,000.00 | 0.00% | $0.00 | $6,000.00 |
| 00013 | RCO 951.49.03 - Remove other subcontractos spoils on June 10, 2005 | | 1.000 | | $3,683.00 | 0.00% | $0.00 | $3,683.00 |
| 00014 | RCO 951.48 - Replace existing 15th street sidewalk per NPS | | 1.000 | | $36,915.00 | 0.00% | $0.00 | $36,915.00 |
| 00015 | RCO 951.44 - Adjust existing concrete structue in conflict with sidewalk @NE side | | 1.000 | | $1,713.00 | 0.00% | $0.00 | $1,713.00 |
| 00016 | RCO 951.37 - undercut and backfill sidewalk @East side | | 1.000 | | $7,412.00 | 0.00% | $0.00 | $7,412.00 |
| 00017 | RCO 951.35 - Repair S.W. Tunnel damage by irrigation Sub | | 1.000 | | $990.00 | 0.00% | $0.00 | $990.00 |

# Grunley-Walsh, LLC

5010 Nicholson Lane
Suite 200
Rockville, MD 20852

Phone: 301-881-8081
Fax: 301-881-8083

**CHANGE ORDER**

**No. 00007**

| | Description | Stock# | Quantity | Units | Unit Price | Tax Rate | Tax Amount | Net Amount |
|---|---|---|---|---|---|---|---|---|
| 00018 | RCO 951.33 - Cut-out Horse Shoe concrete wall at Lodge for the additional light fixtures | | 1.000 | | $3,209.00 | 0.00% | $0.00 | $3,209.00 |
| 00019 | RCO 951.28.02 Chipping concrete wall for control Boxes | | 1.000 | | $498.00 | 0.00% | $0.00 | $498.00 |
| 00020 | RCO 951.25 - Assist in location of Fibroptic leading to Survey Lodge | | 1.000 | | $850.00 | 0.00% | $0.00 | $850.00 |
| 00021 | RCO 951.24 Paint slot drain Grates - directed by NPS | | 1.000 | | $2,448.00 | 0.00% | $0.00 | $2,448.00 |
| 00022 | RCO 951.15 Support operation (labor) for moving Temp. Screen building off the Plaza | | 1.000 | | $3,019.00 | 0.00% | $0.00 | $3,019.00 |
| 00023 | RCO 951.10 Backcharge Lorton for unnecessary cutting and chipping concrete walls | | 1.000 | | $3,637.00 | 0.00% | $0.00 | $3,637.00 |
| 00024 | RCO 950.94 As-built Drawings Monthly submittals for November | | 1.000 | | $1,309.00 | 0.00% | $0.00 | $1,309.00 |
| 00025 | RCO 950.78 Revise sidewalk location running from NW corner towards Monument | | 1.000 | | $12,128.00 | 0.00% | $0.00 | $12,128.00 |
| 00026 | RCO 950.75 - Sleeves for Irrigation system per NPS drawings. | | 1.000 | | $7,774.00 | 0.00% | $0.00 | $7,774.00 |
| 00027 | RCO 950.68 - Additional Brick Manhole over existing 6'-0" x 4'9" Sewer drain system not as shown on drawings | | 1.000 | | $21,179.00 | 0.00% | $0.00 | $21,179.00 |
| 00028 | RCO 950.67 Repair 2" water line damage by Long Fence 8/25/04 @ 17th Street | | 1.000 | | $2,052.00 | 0.00% | $0.00 | $2,052.00 |
| 00029 | RCO 950.62 Bridging footer over existing Tunnel @ SW corner as directed. | | 1.000 | | $4,103.00 | 0.00% | $0.00 | $4,103.00 |
| 00030 | RCO 950.61 Delete work on the Island between 14th and 15th and Independance and Constitution Ave | | 1.000 | | ($126,817.00) | 0.00% | $0.00 | ($126,817.00) |
| 00031 | RCO 950.57.02 - Exploratory Opening of Tunnel per direction of NPS | | 1.000 | | $961.00 | 0.00% | $0.00 | $961.00 |
| 00032 | RCO 950.57.01 Exploratory Opening in the Tunnel SW site | | 1.000 | | $1,272.00 | 0.00% | $0.00 | $1,272.00 |
| 00033 | RCO 950.16.06 - Installation 12" sleeve/pipe under the sidewalk for pump water service | | 1.000 | | $5,942.00 | 0.00% | $0.00 | $5,942.00 |
| 00034 | RCO 950.07.02 - Test Pitting Utilities not shown | | 1.000 | | $2,638.00 | 0.00% | $0.00 | $2,638.00 |

| | |
|---|---|
| **Unit Cost:** | **($24,848.00)** |
| **Unit Tax:** | **$0.00** |
| **Total:** | **($24,848.00)** |

# Grunley-Walsh, LLC

**CHANGE ORDER**

**No. 00007**

5010 Nicholson Lane
Suite 200
Rockville, MD 20852

Phone: 301-881-8081
Fax: 301-881-8083

| | |
|---|---|
| Original Contract Sum was ...................................................... | $6,054,859.00 |
| Net Change by Previously Authorized Requests and Changes ........................ | $380,985.00 |
| The Contract Sum Prior to This Change Order was .................................. | $6,435,844.00 |
| The Contract Sum Will be Decreased ............................................. | ($24,848.00) |
| The New Contract Sum Including This Change Order ..... | $6,410,996.00 |
| The Contract Time Will Not Be Changed ........................................... | |
| The Date of Substantial Completion as of this Change Order Therefore is ... | |

**ACCEPTED:**

Cherry Hill Construction

Grunley-Walsh, LLC

By: _____

By: _____

By: _____

Jerzy Yurek Myckow

Cleo A Kimbembe

Date: _____

Date: _____

Date: _____



## CHERRY HILL CONSTRUCTION, INC.          *A Perini Company*

24 April 2006                                                    Letter No. 280

Grunley – Walsh Joint Venture, LLC
11901 Parklawn Drive, Suite V
Rockville, MD  20852

Attn:   Ms. Cleo Kimbembe
        Project Manager

Re:   Washington Monument Physical Security Project
      CHC Job No. 1017
      **Pending RCO's Settlement Meeting on 04/21/06**

Dear Ms. Kimbembe:

This is to follow-up our meeting held on Friday, 21 April 2006, in your office and the mutual
agreement reached in regards to the pending RCOs.

1)   Grunley-Walsh accepts the following amounts and will issue a change order by the end of
     the business day of 04/28/06:

| RCO No. | Description | Amount |
|---|---|---|
| 950.07.01 | Test Pitting Utilities not shown on the Plans from 02/12/04 thru 07/28/04 | $  2,641.00 |
| 950.09 | 2-Way 2" Fiberoptic Ductbank Plan dated 01/22/04 not shown on Original Plans | $  1,914.00 |
| 950.10 | Conflicts between Existing Utilities and Proposed Wall from 02/17/04 thru 04/30/04 | $ 19,570.00 |
| 950.19.04 | Adjustment of Existing Utilities from 04/14/04 thru 06/29/05 | $ 23,052.00 |
| 950.49 | Revised Storm Drainage at South East Side of Security Wall | $  4,881.00 |
| 950.50.02 | Reset Fence back for WWII Monument | $  2,024.00 |

PLAINTIFF'S
EXHIBIT
tabbies
**5**

FILE- 1017
– 951.20

(Continued)



CHERRY HILL CONSTRUCTION, INC.                                        *A Perini Company*

Grunley – Walsh Joint Venture, LLC
Page Two of Six
24 April 2006

| RCO No. | Description | Amount |
|---|---|---|
| 950.54.01 | Tunnel Leak @ Survey Lodge | $ 8,661.00 |
| 950.56 | Revisions to Storm Drain in S.W. Corner | $ 17,608.00 |
| 950.58 | Replace Existing Inlet @ S.E. Corner due to Bad Conditions | $ 15,143.00 |
| 950.60.01 | Relocate 3" Water Main @ Visitor Center in Conflict with Concrete Wall 08/10/04 to 03/11/05 | $ 21,427.00 |
| 950.60.02 | Relocate 3" Water Main @ Visitor Center in Conflict with Concrete Wall on 03/14/05 | $ 972.00 |
| 950.66 | Conflict between Existing Steam Line and Proposed 15" Storm Drain @ South Side | $ 2,770.00 |
| 950.71 | Repair 6" Water Line @ Sylvan Theatre | $ 3,197.00 |
| 950.78 | Revised Sidewalk Location running from N.W. Corner towards Monument dated 09/30/04 | $ 13,403.00 |
| 950.84 | Direction to Proceed with Work at the Monument Lodge | $ 7,579.00 |
| 950.85 | Conflict between Existing 2" Copper Water Line @ East Side and Storm between D-5 and Existing D-9 | $ 5,138.00 |
| 950.93.01 | Modify Existing Bilco Doors at West Side of Plaza from 12/01/04 thru 04/04/05 | $ 6,399.00 |
| 950.93.02 | Modify Existing Bilco Doors at West Side of Plaza from 06/10/05 thru 06/14/05 | $ 868.00 |

(Continued)



CHERRY HILL CONSTRUCTION, INC.                                    *A Perini Company*

Grunley – Walsh Joint Venture, LLC
Page Three of Six
24 April 2006

| RCO No. | Description | Amount |
|---------|-------------|--------|
| 950.95 | Schedule Completion 06/01/05 (This is only partial settlement for electric blankets previously accepted and billed) | $161,007.00 |
| 950.98 | Existing Electric Conduit in Conflict with the Proposed Concrete Wall @ Visitors Center | $ 10,267.00 |
| 951.01 | Remove Existing Brick and Mortar between Bunker Access and Monument on West Side from 12/15/04 thru 04/20/05 | $ 4,238.00 |
| 951.01.02 | Remove Existing Brick and Mortar between Bunker Access and Monument on West Side on 06/06/05 | $ 1,367.00 |
| 951.14 | Moving Remaining Temp. Concrete Barrier Onsite | $ 916.00 |
| 951.20 | Replacement of S.E. Sidewalk | $ 25,000.00 |
| 951.26.02 | Repair N.E. Drainage damaged by Electrician from 04/15/05 thru 05/11/05 – Greenwald Materials | $ 790.00 |
| 951.27.02 | Revised Longitudinal Slope of Trip Strip Footer on 04/25/05 | $ 1,397.00 |
| 951.27.03 | Demo and Repair 75' of Curb Footer on 04/18/05 | $ 0.00 |
| 951.31 | Revised Grading at Sylvan Theatre dated 04/19/05 | $ 585.00 |
| 951.34 | Mixing Topsoil and Double Handling | $ 15,540.00 |
| 951.36 | Revised Drainage in Front of Sylvan Theatre | $ 2,584.00 |
| 951.42 | Verification of Subgrade prior to Place Topsoil | $ 1,515.00 |

(Continued)



CHERRY HILL CONSTRUCTION, INC.                                    *A Perini Company*

Grunley – Walsh Joint Venture, LLC
Page Four of Six
24 April 2006

| RCO No. | Description | Amount |
|---|---|---|
| 951.48 | Replace Existing Sidewalk on 15th Street | $ 40,022.00 |
| 951.50 | Grade Adjustment on the Existing Access Air Shaft @ West Side within the Oval | $ 5,330.00 |
| 951.51 | Fill South East of Monument within Oval over Existing Water Line | $ 14,730.00 |
| 951.52 | Grade Adjustment South West of Sylvan Theatre over Existing 6" Water Line | $ 11,095.00 |
| 951.55 | Undercut Subgrade on West Side of Monument due to Rocky Conditions | $ 1,032.00 |
| 951.57 | Repair Water Fountain | $ 19,913.00 |
| 951.60 | Lowering Existing Water Line N.E. of Monument | $ 34,393.00 |
| 951.61 | Spreading Sand for Topsoil | $ 2,881.00 |
| 951.63 | Adjustment of 2" Copper, Fire Hose behind Wall @ South Side of Monument | $ 477.00 |
| 951.66 | Adjustment of the Existing Vault in Conflict with Sidewalk @ West Side | $ 3,044.00 |
| 951.67 | Removal of the Construction Entrance @ Independence Avenue | $ 5,241.00 |
| 951.68 | Load and Haul Out Temp. Concrete Barrier to Oxon Hill | $ 1,759.00 |
| 951.74 | Furnish Inlet Cover Replacement to Park Service Maintenance | $ 919.00 |

(Continued)

 **CHERRY HILL CONSTRUCTION, INC.**          *A Perini Company*

Grunley – Walsh Joint Venture, LLC
Page Five of Six
24 April 2006

| <u>RCO No.</u> | <u>Description</u> | <u>Amount</u> |
|---|---|---|
| 951.80 | Cracks in Concrete Sidewalk | $ 32,000.00 |
| 951.82 | Inlet South of Lodge to High | <u>$   3,002.00</u> |
| | **Total** | **$558,291.00** |

2)  The following issues need to be reviewed by Grunley-Walsh, settled with Cherry Hill Construction, Inc. and be included in the change order by and of business day of 04/28/06:

| | | |
|---|---|---|
| 951.05.01 | Overtime in December 2004 | $   1,662.00 |
| 951.05.02 | Overtime in January 2005 | $   1,648.00 |
| 951.05.03 | Overtime in February 2005 | $   1,239.00 |
| 951.05.04 | Overtime in March 2005 | $   2,594.00 |
| 951.05.05 | Overtime in April 2005 | $   4,043.00 |
| 951.05.06 | Overtime in May 2005 | $ 21,484.00 |
| 951.05.07 | Overtime in June 2005 | $ 19,301.00 |
| 951.05.08 | Overtime in July 2005 | $   3,048.00 |
| 951.21 | Extend Limits of Sidewalk East and West of Sylvan Theatre | $ 42,887.00 |
| 951.40.01 | Undercut Unsuitable Subgrade and Backfill using GAB from 05/07/05 thru 06/02/05 | <u>$ 19,439.00</u> |
| | **Total** | **$117,345.00** |

(Continued)



**CHERRY HILL CONSTRUCTION, INC.**                              *A Perini Company*

Grunley – Walsh Joint Venture, LLC
Page Six of Six
24 April 2006

Should you have any questions or comments, please contact the undersigned.

Very truly yours,

CHERRY HILL CONSTRUCTION, INC.

By: _____
    Jerzy Myckow
    Project Manager

JM:nrj
Cc: file/field

AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| | | CONTRACT ID CODE | | Page |
|---|---|---|---|---|
| | | | | 1 of 3 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| 0006 | 09/22/2005 | See Funding Detail | NACC-448E 42400 |

| 6. ISSUED BY | CODE | 2081 | 7. ADMINISTERED BY (If other than Item 6) | CODE |
|---|---|---|---|---|

DSC-CS Contracting Services Division
National Park Service, Attn: Robin Fuchs, P.O. Box 25287, 12795 W. Alameda Parkway
Denver, CO 80225-0287

RECEIVED

SEP 26 2005

| 8. NAME AND ADDRESS OF CONTRACTOR    (No., street, county, State and Zip Code) | | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|

Grunley-Walsh LLC

5010 NICHOLSON LANE, SUITE 200

ROCKVILLE, MD 20852-2625

| 9B. DATED (SEE ITEM 11) |
|---|
| (X) 10A. MODIFICATION OF CONTRACT/ORDER NO. C3059980901 / T3059989135 |
| (X) 10B. DATED (SEE ITEM 13) 12/05/2003 |

| CODE | | FACILITY CODE | |
|---|---|---|---|

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:
(a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

| 12. ACCOUNTING AND APPROPRIATION DATA    (If required) |
|---|
| 2005 - - 9400 - - 2622 - - 477 - - 4240 - - - - - $467,423.00 |

**13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS.
IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| CHECK ONE | |
|---|---|
| ☐ | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| ☐ | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| ☑ | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: FAR Clause 52.243-4, Changes (AUG 1987) |
| ☐ | D. OTHER (Specify type of modification and authority) |

IMPORTANT: Contractor ☐ is not, ☒ X is required to sign this document and return __3__ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION    (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

National Capital Parks-Central, Washington Monument
Upgrade Security and Grounds
Washington DC
NACC-42400

Modification 0004: Add Item 8, Miscellaneous Items, as described in Attachment 1 (3 pages) which is hereby incorporated and becomes a part of this Contract.

All other terms and conditions of the contract remain unchanged.

PLAINTIFF'S
EXHIBIT
6

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) |
|---|---|
| Loren D. Reap General Manager | Lori K. Irish |
| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. United States of America | 16C. DATE SIGNED |
| (Signature of person authorized to sign) | 9/23/05 | BY (Signature of Contracting Officer) | 9/23/05 |

7540-01-152-8070
PREVIOUS EDITION
UNUSABLE

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA FAR (48 CFR)
53.243

| Line·Item Summary | | Document number<br>T3059989135/0006 | | Title<br>TO35 Mod 0006 Misc | | | | | | Page<br>2 of 3 |
|---|---|---|---|---|---|---|---|---|---|---|

Total Funding:   $15,391,078.43

| FYs | Fund | Budget Org | Sub | Object Class | Sub | Program | Cost Org | Sub | Proj/Job No. | Sub | Reporting Category |
|---|---|---|---|---|---|---|---|---|---|---|---|

Division          Closed FYs    Cancelled Fund

| Line Item<br>Number | Description | Delivery Date<br>(Start date to End date) | Quantity | Unit of<br>Issue | Unit Price | Total Cost |
|---|---|---|---|---|---|---|
| | *National Capital Parks, Central, Washington Monument*<br>*Upgrade Security and Grounds Project*<br>*Washington, DC*<br>*NACC 42400* | | | | | |
| 0001 | Washington Monument Upgrade Security and<br>Grounds<br>Change in Extended Description, Unit Price<br>Task Order No. 35:  Construct and Install Above Ground Security Barrier System, Physical Security System, Washington Monument,<br>Washington, DC. | 05/01/2005 | 0.00 | job | $467,423.00 | $467,423.00 |

Previous Total:   $14,923,655.43

Modification Total:   $467,423.00

Grand Total:   $15,391,078.43
(Includes Discounts)

*Points of Contact:*
*Contracting Officer (CO) - Mike Fox (303) 969-2118*
*Contract Specialist (CS) - Robin Fuchs (303) 969-2841*
*Project Manager (PM) - Mike Giller (303) 969-2007*

| Contract Level Funding Summary | Document Number T3059989135/0006 | Title TO35 Mod 0006 Misc | Page 3 of 3 |
|---|---|---|---|

**Funding Strip Code**

2005 - - - 3400 - - 252Z - - 477 - - - 4240 - - - - -

**Change in Funded Amount**

$467,423.00

NEW BID ITEM NO. 8: MISCELLANEOUS

A. Install Government Furnished Trash Cans: MODIFY the contract requirements for ten trash cans. The contractor will install government furnished trash cans. The contract will receive a credit for the material originally required for the trash cans.

(DEDUCT):                    ($3,500)

B. April 1, 2005 Beneficial Occupancy: ADD the costs associated with the Park Beneficial Occupancy on April 1, 2005. Costs include winter weather work, overtime, and acceleration.

ADD:                    $211,638

C. Relocate Screening Facility: ADD the removal, protection, relocation and rehabilitation of the screening facility at the Washington Monument Plaza.

ADD:                    $60,606

D. Relocate 2-inch Water Line: ADD the removal of existing 2-inch water line and the installation of a new 2-inch copper water line.

ADD:                    $33,248

E. NW Sidewalk Relocation: MODIFY the alignment of the North-West sidewalk from the vehicle barrier to the corner of 17th Street and Constitution Avenue. The cost of the work item includes all survey effort, layout, removal of unacceptable sidewalk alignment and extra costs associated with the final alignment.

ADD:                    $13,847

F. Site Utility Modifications: ADD Park requested 4-inch conduit sleeves (16ea) beneath the vehicle barrier wall. ADD the undercutting, removal and backfill of unsuitable soil conditions from 11-May-04 through 18-May-04 and 04-Oct-04 through 05-Oct-04.

ADD:                    $18,989

G. Remove Unsuitable Soil Conditions REA: ADD the undercutting, removal and backfill of unsuitable soil conditions at the Monument plaza from 7-May-05 through 2-Jun-05 and 17-Dec-04 through 1-Feb-05.

ADD:                    $89,402

H. Horseshoe Lights REA: ADD wall niche lights to the horseshoe wall at the Monument Lodge. Cost of this work includes selective demo, light fixtures, electrical circuits and appurtenances, stone work and coordination.

ADD:                    $30,091

I. <u>Fiber Optic Conduit Repair REA:</u> ADD the repair of fiber optic conduit as part of the fiber cable repairs. Cost includes excavation, repair and backfill of areas requiring repair.

ADD:                    $2,930

J. <u>Stone Veneer for Bollard Control Box REA:</u> ADD the installation of Ash Rose granite veneer to the control box at three bollard locations. Cost includes fabrication, delivery and installation of the stone veneer.

ADD:                    $4,600

K. <u>Cover for Plaza Outlet Box REA:</u> ADD a four total decorative covers to the plaza electrical outlet boxes.

ADD:                    $3,572

TOTAL ADD – NEW BID ITEM NO. 8    $467,423

Except as modified above, all work shall be performed in accordance with the provisions of the Task Order where applicable as determined by the Contracting Officer or as otherwise directed by the Contracting Officer.

The Contractor will be compensated for the additional work by modifying the Task Order price as follows:

| Item No. | Original Est. Quantity | Revised Est. Quantity | Item | Unit Price | Original Amount | Amt. of Increase or (Decrease) | Revised Contract Amount |
|---|---|---|---|---|---|---|---|
| 8** | 0 | 1 | Miscellaneous | LS | 0 | $467,423 | $467,423 |

**Indicates new schedule item

No additional contract time will be allowed as a result of the extra work involved and the contract completion date remains May 1, 2005.

Original Contract Amount            $13,993,216.00
Mod 1, Increase                         $7,785.43
Mod 2, Increase                       $133,578.00
Mod 3, Increase                        $35,000.00
Mod 4, Increase                       $435,032.00
Mod 5, Increase                       $269,044.00
Mod 6, Increase                       $467,423.00

REVISED CONTRACT AMOUNT        $15,391,078.43

**CONTRACTOR'S STATEMENT OF RELEASE**

The foregoing Modification No. 0006 is satisfactory and is hereby accepted. In accepting this Modification No. 0006, the Contractor acknowledges that he has no unsatisfied claim against the Government arising out of or resulting from this modification, and the Contractor hereby releases and discharges the Government from any and all claims or demands whatsoever arising out of or resulting from this Modification.

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | 1 CONTRACT ID CODE | Page 1 of 3 |
|---|---|---|---|

| 2 AMENDMENT/MODIFICATION NO. 0007 | 3 EFFECTIVE DATE 10/13/2005 | 4 REQUISITION/PURCHASE REQ. NO. See Funding Detail | 5 PROJECT NO. (If applicable) NACC-448E 42400 |
|---|---|---|---|

| 6 ISSUED BY                                          CODE | 2081 | 7 ADMINISTERED BY (If other than Item 6)          CODE | |
|---|---|---|---|
| DSC-CS Contracting Services Division National Park Service. Attn: Robin Fuchs.P O  Box 25287, 12795 W  Alameda Parkway Denver, CO 80225-0287 | | | |

| 8 NAME AND ADDRESS OF CONTRACTOR    (No., street, county, State and Zip Code) | | 9A AMENDMENT OF SOLICITATION NO |
|---|---|---|
| Grunley-Walsh LLC<br><br>5010 NICHOLSON LANE, SUITE 200<br><br>Rockville, MD 20852-2625 | | 9B DATED (SEE ITEM 11) |
| | (X) | 10A MODIFICATION OF CONTRACT/ORDER NO. C3059080001 / T305908135 |
| | (X) | 10B DATED (SEE ITEM 13) 12/05/2003 |

| CODE    B | FACILITY CODE | |
|---|---|---|

11 THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14  The hour and date specified for receipt of Offers   ☐ is extended.   ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted, or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers  FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER  If by virtue of this amendment you desire to change an offer already submitted  such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and the amendment, and is received prior to the opening hour and date specified.

| 12 ACCOUNTING AND APPROPRIATION DATA    (If required) | | | | |
|---|---|---|---|---|
| 7008 | 3400 | 2522 | 477 | 4240 | $681,142.00 |

13 THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS IT MODIFIES THE CONTRACT/ORDER NO  AS DESCRIBED IN ITEM 14

CHECK ONE

☐ A  THIS CHANGE ORDER IS ISSUED PURSUANT TO. (Specify authority)  THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO  IN ITEM 10A

☐ B  THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office  appropriation date. etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43 103(b)

☑ C  THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:

FAR Clause 52 243-4, Changes (Aug 1987)

☐ D  OTHER (Specify type and authority)

E  IMPORTANT.  Contractor   ☐ is not,   ☒ is required to sign this document and return   3   copies to the issuing office

14 DESCRIPTION OF AMENDMENT/MODIFICATION     (Organized by UCF section headings, including solicitation/contract subject matter where feasible )

National Capital Parks Central, Washington Monument
Upgrade Security and Grounds
Washington, DC
NACC-42400

Modification 0007: Add item 9. Miscellaneous Items, as described in Attachment 1 (2 pages) which is hereby incorporated and becomes a part of this Task Order.

All other terms and conditions of the Task Order remain unchanged

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect

| 15A NAME AND TITLE OF SIGNER (Type or print) Loren D. Rader General Manager | 16A NAME AND TITLE OF CONTRACTING OFFICER (Type or print) Lori K. Irish | |
|---|---|---|
| 15B CONTRACTOR/OFFEROR<br>(Signature of person authorized to sign) | 15C DATE SIGNED 10/18/05 | 16B United States of America<br>BY  Lori K. Irish<br>(Signature of Contracting Officer) | 16C DATE SIGNED 10/19/05 |

NSN 7540-01-152-8070
PREVIOUS EDITION
UNUSABLE

STANDARD FORM 30 (REV. 10-83)
Prescribed by USA, FAR (48 CFR)
53.243

| Line Item Summary | | Document Number<br>T305998911S/0007 | Title<br>TO35 Mod 0007 Misc | | | | Page<br>2 of 3 |
|---|---|---|---|---|---|---|---|

Total Funding:  $16,072,220.43

| FYs | Fund | Budget Org | Sub | Object Class | Sub | Program | Cost Org | Sub | Proj/Job No. | Sub | Reporting Category |
|---|---|---|---|---|---|---|---|---|---|---|---|

Division          Closed FYs    Cancelled Fund

| Line Item Number | Description | Delivery Date<br>(Start date to End date) | Quantity | Unit of Issue | Unit Price | Total Cost |
|---|---|---|---|---|---|---|
| | *National Capital Parks, Central, Washington Monument Upgrade Security and Grounds Project Washington, DC NACC 42400* | | | | | |
| 0001 | Washington Monument Upgrade Security and Grounds<br>Change in Unit Price<br>Task Order No. 35:  Construct and Install Above Ground Security Barrier System, Physical Security System, Washington Monument, Washington, DC | 05/01/2005 | 0.00 | job | $681,142.00 | $681,142.00 |

|  | |
|---|---|
| Previous Total: | $15,391,078.43 |
| Modification Total: | $681,142.00 |
| Grand Total:<br>(Includes Discounts) | $16,072,220.43 |

*Points of Contact:*
*Contracting Officer (CO) - Mike Fox (303) 969-2118*
*Contract Specialist (CS) - Robin Fuchs (303) 969-2841*
*Project Manager (PM) - Mike Giller (303) 969-2007*

| Contract Level Funding Summary | Document Number T30599891135/0007 | Title TO35 Mod 0007 Misc | Page 3 of 3 |
|---|---|---|---|

**Funding Strip Code**

2006 - - 3400 - - 252Z - 477 - - 4240 - - - - -

**Change in Funded Amount**

$681,142 00

Reference Requisition:    R2011030015

NEW BID ITEM NO. 9: MISCELLANEOUS

A. Install Additional Sod: ADD the costs associated with the additional sod required for the 37 acre WAMO grounds site. Costs include fine grading and preparation, installation and maintenance.

ADD:          $384,206

B. Additional Lights on the Screening Facility: ADD the costs associated installation of frame work, electrical and three base lights on the roof of the screening facility.

ADD:          $5,307

C. Asphalt Installation at 16th Street and WASA Well: ADD installation of temporary asphalt at the DC WASA stop log structure and at 16th Street to enable the re-opening of the Washington Monument grounds for the July 4th celebration.

ADD:          $8,403

D. South-East Sidewalk Re-Pour: ADD the cost to remove and replace the south-east oval sidewalk at a 0% cross slope with the approved concrete design.

ADD:          $25,000

E. 16th Street Pull-Off: ADD the installation of two curb storm drop inlets, two yard storm drop inlets, grading, sidewalks, asphalt and line striping at the 16th Street Pull-Off.

ADD:          $45,000

G. PEPCO Manhole Expansion for Irrigation Pump Vault: ADD the cost to upgrade PEPCO manhole for the purpose of upgrading the electrical service for the WAMO grounds irrigation pump vault.

ADD:          $65,000

I. Monument Lodge Stone Restoration: ADD the cost to repoint, patch and clean the Monument Lodge.

ADD:          $67,441

K. Additional Site Utility Unforeseen Conditions: ADD the cost to repair or correct existing site utility conditions.

ADD:          $80,785

TOTAL ADD -- NEW BID ITEM NO. 9          $681,142

Except as modified above, all work shall be performed in accordance with the provisions of the Task Order where applicable as determined by the Contracting Officer or as otherwise directed by the Contracting Officer.

The Contractor will be compensated for the additional work by modifying the Task Order price as follows:

| Item No. | Original Est. Quantity | Revised Est Quantity | Item | Unit Price | Original Amount | Amt. of Increase or (Decrease) | Revised Contract Amount |
|---|---|---|---|---|---|---|---|
| 9** | 0 | 1 | Miscellaneous | LS | 0 | $681,142 | $681,142 |

**Indicates new schedule item

As a result of this Modification, the Task Order completion date remains unchanged at May 1, 2005.

| | |
|---|---|
| Original Contract Amount | $13,993,216.00 |
| Mod 1, Increase | $7,785.43 |
| Mod 2, Increase | $133,578.00 |
| Mod 3, Increase | $35,009.00 |
| ~~Mod 4, Increase~~ | ~~$435,032.00~~ |
| Mod 5, Increase | $269,044.00 |
| Mod 6, Increase | $467,423.00 |
| Mod 7, Increase | $681,142.00 |
| REVISED CONTRACT AMOUNT | $16,072,220.43 |

## CONTRACTOR'S STATEMENT OF RELEASE

The foregoing Modification No. 0007 is satisfactory and is hereby accepted. In accepting this Modification No. 0007, the Contractor acknowledges that he has no unsatisfied claim against the Government arising out of or resulting from this modification, and the Contractor hereby releases and discharges the Government from any and all claims or demands whatsoever arising out of or resulting from this Modification.

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | 1. CONTRACT ID CODE | Page 1 of 5 |
|---|---|---|---|
| 2. AMENDMENT/MODIFICATION NO. 0008 | 3. EFFECTIVE DATE 05/01/2005 | 4. REQUISITION/PURCHASE REQ. NO. See Funding Detail | 5. PROJECT NO. (If applicable) NACC-448E 042400 |

| 6. ISSUED BY | CODE | 2081 | 7. ADMINISTERED BY (If other than Item 6) | CODE | |
|---|---|---|---|---|---|
| DSC-CS Contracting Services Division National Park Service, Attn: Robin Fuchs, P.O. Box 25287, 12795 W. Alameda Parkway Denver, CO 80225-0287 | | | | | |

| 8. NAME AND ADDRESS OF CONTRACTOR     (No., street, county, State and Zip Code) | 9A. AMENDMENT OF SOLICITATION NO. | |
|---|---|---|
| Bassem Soueidan/Cleo Kimbembe Grunley-Walsh LLC 5010 NICHOLSON LANE, SUITE 200 Rockville, MD 20852-2625 | 9B. DATED (SEE ITEM 11) | |
| | (X) | 10A. MODIFICATION OF CONTRACT/ORDER NO. C3059980901 / T3059989135 |
| | (X) | 10B. DATED (SEE ITEM 13) 12/05/2003 |
| CODE   B. | FACILITY CODE | |

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:
(a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

| 12. ACCOUNTING AND APPROPRIATION DATA   (If required) | |
|---|---|
| 2006    3400    2522    477    4240    $312,785.00 | |

**13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS.
IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| CHECK ONE | | |
|---|---|---|
| ☐ | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. | |
| ☐ | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). | |
| ☑ | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: Sect 76, 52.243-4, Changes (AUG 1987) & Sect. 93, 52.211-12 Liquidated Damages-Constructn (APR 1984) | |
| ☐ | D. OTHER (Specify type of modification and authority) | |

E. IMPORTANT:  Contractor ☐ is not, ☒ is required to sign this document and return __3__ copies to the issuing office.

**14. DESCRIPTION OF AMENDMENT/MODIFICATION**     (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

National Capitol Parks - Central, Washington Monument
Upgrade Physical Security System and Grounds
Washington, DC
NACC 042400

A. In accordance with section 76 of the base IDIQ contract, clause 52.243-4, entitled Changes (AUG 1987), this modification is to incorporate miscellaneous work that is required for the performance of this project.

As a result of these changes, the Scope of Services for this task order is revised as follows in the attached Modification Attachment No. 1 (2 pages) which is hereby incorporated as a part of this task order.

B. In accordance with section 93 of the base IDIQ contract, clause 52.211-12, entitled Liquidated Damages - Construction (Deviation) (APR 1984), this modification is to establish the amount of liquidated damages that will be assessed for each day of delay against this task order.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) Brian D. Raab, President | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) John M. Fox | |
|---|---|---|
| 15B. CONTRACTOR/OFFEROR (Signature of person authorized to sign) | 15C. DATE SIGNED 1.19.06 | 16B. United States of America BY (Signature of Contracting Officer) | 16C. DATE SIGNED 2/4/06 |

| NSN 7540-01-152-8070 PREVIOUS EDITION UNUSABLE | STANDARD FORM 30 (REV. 10-83) Prescribed by GSA FAR (48 CFR) 53.243 |
|---|---|

| Line Item Summary | Document Number<br>T3059989135/0008 | Title<br>TO35 Mod 0008 Misc WAMO | | Page<br>2 of 5 |
|---|---|---|---|---|

Total Funding:   $16,385,005.43

| FYs | Fund | Budget Org | Sub | Object Class | Sub | Program | Cost Org | Sub | Proj/Job No. | Sub | Reporting Category |
|---|---|---|---|---|---|---|---|---|---|---|---|

Division                         Closed FYs    Cancelled Fund

| Line Item Number | Description | Delivery Date<br>(Start date to End date) | Quantity | Unit of Issue | Unit Price | Total Cost |
|---|---|---|---|---|---|---|

*National Capital Parks, Central, Washington Monument*
*Upgrade Security and Grounds Project*
*Washington, DC*
*NACC 42400*

| 0001 | Washington Monument Upgrade Security and Grounds | 11/30/2005 | 0.00 | job | $312,785.00 | $312,785.00 |

Change in Delivery Date, Performance Period, Unit Price
Task Order No. 35:  Construct and Install Above Ground Security Barrier System, Physical Security System, Washington Monument, Washington, DC.

| | |
|---|---|
| Previous Total: | $16,072,220.43 |
| Modification Total: | $312,785.00 |
| Grand Total: | $16,385,005.43 |
| (Includes Discounts) | |

Points of Contact:
Contracting Officer (CO) - Mike Fox (303) 969-2118
Contract Specialist (CS) - Robin Fuchs (303) 969-2841
Project Manager (PM) - Mike Giller (303) 969-2007

| Contract Level Funding Summary | Document Number T3059989135/0008 | Title TO35 Mod 0008 Misc WAMO | Page 3 of 5 |
|---|---|---|---|

**Funding Strip Code**

2006 - - - 3400 - - 252Z - - 477 - - - 4240 - - - - - -

**Change in Funded Amount**

$312,785.00

Reference Requisition:    R2011060113

| Award/Contract Modification | Document No. T3059989135/0008 | Document Title TO35 Mod 0008 Misc | Page 4 of 5 |
|---|---|---|---|

### TABLE OF CONTENTS

COMMERCIAL CLAUSES      5
     1     Liquidated Damages--Construction      5

| Award/Contract Modification | Document No. T3059989135/0008 | Document Title TO35 Mod 0008 Misc | Page 5 of 5 |
|---|---|---|---|

## COMMERCIAL CLAUSES

1    52.211-12    LIQUIDATED DAMAGES--CONSTRUCTION                SEPTEMBER 2000

(a) If the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government in the amount of $800 for each calendar day of delay until the work is completed or accepted.

(b) If the Government terminates the Contractor's right to proceed, liquidated damages will continue to accrue until the work is completed. These liquidated damages are in addition to excess costs of repurchase under the Termination clause.

(End of clause)

Modification No. 0008, Attachment No. 1

## CONTRACT BID SCHEDULE

### (NEW) BID ITEM NO. 10: MISCELLANEOUS:

A. The following items were combined as a price negotiation with the contractor. This method of negotiation was utilized due to the lack of cost information from the contractor on several items.

1. Delete Island work as bordered by 14th Street, 15th Street, Constitution Avenue and Independence Avenue
2. Delete of storm drainage on the North side of the Washington Monument Grounds
3. Substitute HDPE Pipe for Concrete Pipe for Storm Drainage Systems
4. Delete Storm Drainage System at Monument Plaza Benches
5. Modify Bollard System
6. Additional Sidewalk Replacement on South side of grounds.
7. BENJI apron and storm drainage
8. Overtime Costs Associated with the July 4, 2005 Reopening of the Grounds
9. Additional Wood Fence Relocation at 15th Street REA
10. Install Government Furnished Light Pedestals and Fixtures REA
11. Additional site utility unforeseen conditions
12. Water Fountain Adjustments
13. CCTV Fiber Conduit Repair REA
14. Additional Sidewalk Placement at 15th Street and Madison
15. Install additional CCTV conduits at the Monument Lodge
16. Install a 2 inch drain line from Bunker No. 2 to the storm drain inlet at the Jefferson Pier.

ADD:                $150,000

B. Re-Grade and Sod the North WAMO grounds: ADD the cost to properly grade approximately 6.4 acres of the northern WAMO grounds to a 1% slope and prepare for sod, the installation of 750lf of drain tile with 6 drop inlets, modify existing utilities as required, and 6.4ac of sod.

ADD:                $144,000

C. Additional Work at 16th Street: ADD the cost to replace additional concrete sidewalk and to place traffic markings in the 16th street pull-off.

ADD:                $5,004

D. Irrigation Donut Mockup: ADD the cost to provide a mockup of 10 irrigation donuts on the WAMO grounds.

ADD:                $1,055

E. Additional Sod for the Monument Lodge Area: ADD the cost to place 0.8 ac of sod at the Monument Lodge instead of hydroseed.

ADD:                $12,726

TOTAL ADD – Bid Item No. 10 (add A thru E)        $312,785

Washington Monument Upgrade Security and Grounds
Contract No. 1443C3059980901
Task Order No. T3059989135
Page 1 of 2

Modification No. 0008, Attachment No. 1

Except as modified above, all work shall be performed in accordance with the provisions of the Task Order where applicable as determined by the Contracting Officer or as otherwise directed by the Contracting Officer.

The Contractor will be compensated for the additional work by modifying the Task Order price as follows:

| Item No. | Orig. Est. Quant. | Revised Est. Quant. | Description | Original Unit Price | Revised Unit Price | Original Amount | Amt. of Increase or (Decrease) | Revised Amount |
|---|---|---|---|---|---|---|---|---|
| 10** | N/A | 1 | Miscellaneous | N/A | LS | N/A | $312,785 | $312,785 |

**Indicates new schedule item

An allowance of two hundred and thirteen (213) additional calendar days will be made as a result of the additional work involved under this modification. The contract completion date is hereby changed from May 1, 2005 to November 30, 2005.

This Modification No. 0008 results in an increase of $312,785.00 in the contract amount. The revised amount is accordingly established as follows:

| | |
|---|---|
| Original Contract Amount | $13,993,216.00 |
| Modification No. 0001 - Increase | $7,785.43 |
| Modification No. 0002 - Increase | $133,578.00 |
| Modification No. 0003 - Increase | $35,000.00 |
| Modification No. 0004 - Increase | $435,032.00 |
| Modification No. 0005 - Increase | $269,044.00 |
| Modification No. 0006 - Increase | $467,423.00 |
| Modification No. 0007 - Increase | $681,142.00 |
| Modification No. 0008 - Increase | $312,785.00 |
| **Revised Contract Amount** | **$16,385,005.43** |

## CONTRACTOR'S STATEMENT OF RELEASE

The foregoing Modification No. 0008 is satisfactory and is hereby accepted. In accepting this Modification No. 0008, the Contractor acknowledges that he has no unsatisfied claim against the Government arising out of or resulting from this modification, and the Contractor hereby releases and discharges the Government from any and all claims or demands whatsoever arising out of or resulting from this Modification.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

CHERRY HILL CONSTRUCTION, INC.   \*

        Plaintiff,          \*

    v.               \*    Case No.:  8:07-cv-3476-AW
                        Judge Alexander Williams, Jr.

GRUNLEY-WALSH JOINT      \*
VENTURES, LLC, *et al*.

                       \*

        Defendants.
\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## <u>ORDER</u>

Upon consideration of the Defendants' Motion to Stay Pending Exhaustion of Mandatory Disputes Procedures and Plaintiff's Opposition thereto, it is this _____ day of _____, 2008, by the United States District Court for the District of Maryland,

ORDERED that the Defendants' Motion to Stay Pending Exhaustion of Mandatory Disputes is hereby DENIED.

                                         _____
                                         Honorable Alexander Williams, Jr.
                                         Judge, United States District Court
                                         for the District of Maryland